STATE of Missouri, Respondent,

v.

Tyrone C. BATEMAN, Appellant.

No. SC 90528.

Supreme Court of Missouri,
En Banc.

Aug. 3, 2010.

Jessica M. Hathaway, Public Defender's Office, St. Louis, for Appellant.

Richard A. Starnes, Attorney General's Office, Jefferson City, for Respondent.

LAURA DENVIR STITH, Judge.

Tyrone Bateman was convicted of first-degree murder in the shooting death of his cousin Miles Bateman and sentenced to life in prison without parole. On appeal, Tyrone[1] argues that the evidence was insufficient to allow the jury to find beyond a reasonable doubt that he deliberated before shooting the victim and that the trial court erred in overruling his challenge to the state's peremptory strike of an African–American venireperson under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Finding no error, this Court affirms. Tyrone left the victim's home after the two engaged in a physical altercation. He drove to his own house to retrieve his shotgun, drove back to the victim's house, kicked down the door, shot and killed the victim, and then drove from the scene while exclaiming, "I got him. I got him." This evidence, if believed, was sufficient to permit a reasonable juror to find the element of deliberation beyond a reasonable doubt.

1. To avoid confusion, this Court refers to both the victim and the defendant by their first names, as both have the last name of Bateman. No disrespect is intended.

This Court also finds no reversible error in the trial court's rejection of Tyrone's claim that the state's strike of an African-American venireperson, B.T., violated *Batson*. In support, Tyrone argues the state's explanation that it struck B.T. because he showed initiative and leniency in *sua sponte* asking about the degrees of murder was pretextual in that the state failed to exercise a peremptory challenge as to a Caucasian venireperson who also asked a question about punishment and because the questions were asked only after the prosecutor solicited questions from the venire. The state argues that there was no similarly situated Caucasian juror, and, therefore, the strike was not pretextual.

The focus of some prior cases on the "crucial" nature of the presence of a similarly situated juror should be understood to mean that this evidence often is determinative of the presence of pretext; the presence of such a juror is not necessary to find pretext, however. Pretext is determined in light of the entirety of the circumstances, not by the presence of a single factor. *See, e.g., State v. Parker*, 836 S.W.2d 930 (Mo. banc 1992).

As discussed below, factors that have been identified as relevant, in addition to the presence of a similarly situated Caucasian juror, include, but are not limited to, the striking of a disproportionate number of minorities, the number of minorities left on the jury, the use of strikes against non-minority jurors, the logical relevance of the prosecutor's proffered explanation, objective factors bearing on the state's motive to discriminate, and the prosecutor's pattern of practice such as his or her demeanor and history of making or not making pretextual strikes.

Tokenism in leaving some minorities on the jury or in striking some non-minorities will not prevent a strike from being found to be pretextual where other factors sup-port a finding of pretext, and the determination of pretext must be made based on the prosecutor's statement at the time of the *Batson* challenge; new reasons why a strike *could have been made* may not be offered on appeal.

Here, however, the challenge was made solely on the bases that there was a similarly situated Caucasian juror who was not stricken and that the prosecutor mischaracterized the nature of a question asked by the stricken juror. The record shows that the Caucasian venireperson was not similarly situated and that his answers supported the prosecutor's statement that he believed B.B. would be more favorable to the prosecution than would the B.T. The other minor misstatements by the prosecutor were not significant or dispositive, and the trial court did not clearly err in finding that the strike of B.T. was race-neutral.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Underlying Criminal Action

The evidence shows that Tyrone and Miles Bateman were cousins living on the same street. After a night out together, Miles slept at Tyrone's house. When Miles awoke the next morning, he discovered Tyrone had borrowed his van and some amount of money. Tyrone later returned the van without gas. The money was not returned. Tyrone left a pair of shoes or boots in the van, which Miles kept until he could collect the missing money from Tyrone.

A few days later, on March 21, 2005, Miles was repairing a flat tire in front of his mother's house, where he lived, when Tyrone drove up with a mutual friend to retrieve the shoes. When Miles refused to give back the shoes until Tyrone returned his money, an argument ensued and escalated into a physical confrontation. Tyr-

one struck or grabbed Miles, who then retaliated by hitting Tyrone in the head with the jack handle he was holding. Tyrone's head began to bleed profusely, and the two wrestled on the ground until the fight was broken up by Miles' mother. Tyrone told Miles, "... [W]hen you get off me, I'm going to hurt you real bad." Miles went into his house and then the bathroom to wash his face.

Tyrone returned to his car and drove in reverse down a one-way street. Upon reaching his house, Tyrone retrieved a shotgun. Tyrone then returned to Miles' house, kicked down the front door and shot Miles once in the area of his left chest. Tyrone did not try to help Miles or seek medical attention for him after the shooting. Instead, he got back into his car and drove away, exclaiming, "I got him. I got him."

During a subsequent search of Tyrone's house, police recovered a shotgun and shell consistent with the gun used to shoot Miles. Miles died as a result of the injuries inflicted by the gunshot. Police later apprehended Tyrone at an apartment where he was partially hidden in the closet of a child's bedroom. Tyrone resisted arrest so aggressively that police subdued him with a Taser.

The state charged Tyrone with first-degree murder. At trial, Tyrone admitted he shot Miles but argued he was guilty only of voluntary manslaughter.

### B. Jury Selection

At the start of the second day of *voir dire,* the prosecutor asked whether any of the venirepersons, after having the night to think about the previous day's questions, had a "response" or a "rethought:"

[H]as anyone else had a chance to sleep on anything about what we talked about and have a response to anything we may have talked about yesterday or you rethought as of last night or today.

B.B., a Caucasian venireperson, replied:

Yesterday we were talking. And I'm not talking about presumption of innocence here or anything like that. But the State is not asking for the death penalty or it's been ruled out completely. And I'm trying, in my mind, to justify why if we determine that there was guilt in this case that we wouldn't be allowed to consider all possible punishment. Not that we would necessarily go for that, but why would we eliminate some of the punishment possibilities from the deliberation?

The prosecutor generally explained why the prosecutor might seek the death penalty in only certain types of murder cases and that the jury would not be involved in sentencing.

Later in *voir dire,* the prosecutor asked whether the venire members could follow the "instructions as to one of the elements in the case" even if "it may differ from what you thought was the law or what you think the law ought to be...." The prosecutor continued, "I want to know can you follow the Court's instructions even if it differs from your own?" After five venirepersons answered in the affirmative, the prosecutor asked B.T., an African–American venireperson:

[Prosecutor]: Juror 217, can you follow the Court's instruction even if it differs from your own personal thoughts or beliefs on the issue?

[B.T.]: Juror 217. I believe I can. But one question, when you say degree, what do you mean by that, First Degree, Second Degree?

[Prosecutor]: That will be entailed in the instruction that the Court gives you that there are elements that go into making a homicide a Murder in the First Degree. There are certain re-

quirements, certain things that need to be sustained before it's Murder in the First Degree or to make it Murder in the First Degree.

[B.T.]: I mean, is that like more of a harsher sentence?

[Prosecutor]: Murder in the First Degree is a higher charge, per se, than Murder in the Second Degree or even manslaughter. There's a kind of ranging of them. Murder in the First Degree in some instances carries the death penalty. It does not in this case. Any of those questions that you have as far as degrees go, the Court will give you an instruction on.

Let me ask you this: If your personal belief is one thing but the Court's instructions is another, will you be able to follow the Court's instruction and apply it to the facts of the case?

[B.T.]: Yes.

[Prosecutor]: You'd be able to set aside even if you disagree with it?

[B.T.]: (Juror nods head.)

The Court: Is that a yes?

[B.T.]: Yes. I'm sorry.

The prosecutor did not initially include B.T. in his peremptory strikes, but when a *Batson* challenge was upheld as to one of the prosecutor's original strikes, he struck B.T. After the defense made a *Batson* challenge, the prosecutor explained:

You honor, I struck [B.T.] for the sole reason that each—before I asked a question about following the Court's instructions and [alluding] as to different degrees of murder or homicide shortly after reading the charge, it was a Murder in the First Degree case, [B.T.] beat me to that question and asked if there are different degrees of murder charges and are there other things than First Degree to consider. And the reason I strike him … is because I take that

initiative that he showed as, you know, maybe a sign that he has a more lenient bend on his personal disposition in this matter or in criminal matters.

Defense counsel argued this explanation was pretextual in that B.T.'s question merely showed that he did not understand the differing degrees of homicide, and it was responsive to the prosecutor's question whether he could follow the court's instructions. Defense counsel also argued venireperson B.B. was similarly situated to B.T. because B.B. showed initiative in asking why the jury could not consider capital punishment in this case. The court denied the challenge, finding that the strike was race-neutral. Defense counsel later struck B.B. Another strike by defense counsel was disallowed by the Court for not being race-neutral. Tyrone was found guilty of first-degree murder and armed criminal action. The court sentenced Tyrone to life imprisonment without the possibility of probation or parole for first-degree murder and a consecutive term of 10 years for armed criminal action.

Tyrone appeals, raising two points: (1) the evidence was insufficient to support a finding of deliberation; and (2) the trial court clearly erred in overruling his objection to the prosecutor's peremptory strike of B.T. under *Batson*, which violated the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 2 and 18(a) of the Missouri Constitution. Following a decision by the Missouri Court of Appeals, Eastern District, this Court granted transfer. Mo. Const. Art. V, § 10.

## II. STANDARD OF REVIEW

■ In reviewing the sufficiency of the evidence, this Court's "review is limited to whether the State has introduced sufficient evidence for any reasonable juror to have been convinced of guilt beyond

a reasonable doubt." *State v. Grim,* 854 S.W.2d 403, 419 (Mo. banc 1993), citing, *Jackson v. Virginia,* 443 U.S. 307, 319, n. 13, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[T]he Court does not act as a super juror with veto powers, but gives great deference to the trier of fact." *State v. Chaney,* 967 S.W.2d 47, 52 (Mo. banc 1998) (internal citation and quotation marks omitted). "On review, the Court accepts as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary." *Grim,* 854 S.W.2d at 404. " '[T]his inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Chaney,* 967 S.W.2d at 52, quoting, *Jackson,* 443 U.S. at 318–319, 99 S.Ct. 2781.

■ "In reviewing a circuit court's decision concerning a *Batson* challenge, a circuit court is accorded great deference because its findings of fact largely depend on its evaluation of credibility and demeanor." *Kesler–Ferguson v. Hy–Vee, Inc.,* 271 S.W.3d 556, 558 (Mo. banc 2008). Therefore, the "court's findings on a *Batson* challenge will be set aside [only] if they are clearly erroneous, meaning the reviewing court is left with the definite and firm conviction that a mistake has been made." *State v. McFadden,* 216 S.W.3d 673, 675 (Mo. banc 2007) ("*McFadden II* ").

### III. EVIDENCE SUFFICIENT TO SUPPORT FIRST–DEGREE MURDER

■ Tyrone challenges the sufficiency of the evidence to sustain the first-degree murder conviction. He argues the state failed to prove beyond a reasonable doubt that Tyrone knowingly caused Miles' death after deliberation upon the matter. *See* § 565.020.1, RSMo 2000. "Deliberation" is defined as "cool reflection for any length of time no matter how brief...." § 565.002(3), RSMo 2000. "Proof of deliberation does not require proof that the defendant contemplated his actions over a long period of time...." *State v. Johnston,* 957 S.W.2d 734, 747 (Mo. banc 1997). "Deliberation, like most elements of mens rea, must ordinarily be proved through proof of the circumstances surrounding the killing." *State v. O'Brien,* 857 S.W.2d 212, 218–19 (Mo. banc 1993). "Without evidence of deliberation, an intentional killing is second-degree murder...." *State v. Cole,* 71 S.W.3d 163, 169 (Mo. banc 2002).

■ Tyrone argues that "no other reasonable inference" can be drawn but that he was acting under the influence of a violent "anger or passion" when he shot Miles and was not acting out of deliberation. In support, he notes it was undisputed that he had just received a head injury and that he recklessly drove the car backward down the street toward his house to retrieve his shotgun.

While this evidence may have permitted the jury to determine that he shot and killed his cousin in the heat of anger or passion, it did not require the jury to reach this determination. The evidence was sufficient to support the jury's determination beyond a reasonable doubt that he shot and killed Miles after deliberation, that is, after cool reflection, "no matter how brief."

In particular, the state presented evidence that the fighting between Tyrone and Miles stopped once Miles' mother separated them and Miles retreated into the house. Tyrone, therefore, had ample opportunity to terminate the confrontation. *State v. Norman,* 243 S.W.3d 466, 470

(Mo.App.2007) (deliberation may be inferred when a perpetrator has ample opportunity to terminate the crime). Instead, Tyrone threatened Miles, saying, "I'm going to hurt you real bad." *State v. Overkamp,* 646 S.W.2d 733, 737 (Mo.1983) ("Previous threats by the accused to kill the deceased are admissible to show malice and premeditation or state of mind"). Tyrone then got in his car and drove home. Rather than staying in this safe location, Tyrone got his gun and drove back to the scene of the altercation. Such a "time lapse between the threat and the shooting would have established a period of deliberation." *Rhodes v. State,* 157 S.W.3d 309, 313 (Mo.App.2005). "Where the defendant commits a murder which, because of the particular method of attack, required some time to complete, this Court has permitted an inference of deliberation." *O'Brien,* 857 S.W.2d at 219.

▆ Tyrone's choice not to return empty-handed but to bring a deadly weapon with him as he went back to confront his cousin also supports the jury's finding of deliberation. *State v. Stacy,* 913 S.W.2d 384, 387 (Mo.App.1996) (bringing a deadly weapon to the commission of a crime supports a finding of deliberation). Tyrone then kicked down his cousin's front door and fired his shotgun directly at Miles from only 3 to 5 yards away. The shot caused serious injury to Miles' left lung and major blood vessels of the left shoulder. It fractured facial bones, causing a disfiguration of Miles' chin. Instead of calling for help when he saw how seriously Miles was injured, Tyrone fled the scene while exclaiming, "I got him. I got him." "[F]ailure to seek medical help for a victim strengthens the inference that the defendant deliberated." *State v. Strong,* 142 S.W.3d 702, 717 (Mo. banc 2004).

There was substantial evidence from which a reasonable juror could find the element of deliberation beyond a reasonable doubt.

## IV. BATSON CHALLENGE

In 1880, the United States Supreme Court invalidated a state statute providing that African Americans could not serve as jurors. *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880). While *Strauder* had the effect of forcing states to abandon "statutes that expressly restricted jury service to whites," local officials found ways around its holding. For example, "[i]n some jurisdictions, names of black residents were included on the lists from which jury panels" were drawn, but were placed on "color paper so they could be easily avoided during the supposedly random drawing of the venire." EQUAL JUSTICE INITIATIVE, ILLEGAL RACIAL DISCRIMINATION IN JURY SELECTION: A CONTINUING LEGACY 10 (2010). Such practices led the Supreme Court to find in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), that African Americans continued to be precluded from jury service after *Strauder,* often under the guise of prosecutorial peremptory challenges. To eliminate such conduct, *Swain* held that a defendant could show his or her equal protection rights were violated by showing the prosecutor "consistently and systematically exercised their strikes to prevent any and all Negroes on petit jury venires from serving on the petit jury itself." *Id.* at 222–23.

Following the 1965 *Swain* decision, some state officials "turned to somewhat more subtle ways of keeping blacks off jury venires." *Batson v. Kentucky,* 476 U.S. 79, 103, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (Marshall, J., concurring). "Although the means used to exclude blacks ... changed[,] the same pernicious conse-

quence" remained. *Id.*[2] As a result, as this Court noted in *State v. Parker,* 836 S.W.2d 930, 933 (Mo. banc 1992), the "*Swain* burden of proof imposed a nearly insurmountable obstacle to the vindication of black persons' equal protection rights as evidenced by the fact that in the twenty-one years after *Swain,* only two defendants were able to establish a case of discrimination." *See also* Theodore McMillian & Christopher J. Petrini, BATSON V. KENTUCKY: A PROMISE UNFULFILLED, 58 UMKC L.Rev. 361, 365 (1990) (commenting on the pre-*Batson* effect of the *Swain* holding).

*Batson* removed "the crippling burden of proof imposed upon defendants by *Swain,*" *Parker,* 836 S.W.2d at 933, and made a significant stand against such patent injustice when it held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at 89, 106 S.Ct. 1712. Such "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection...." *Id.* at 86, 106 S.Ct. 1712. In *Powers v. Ohio,* 499 U.S. 400, 409–11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Supreme Court subsequently recognized that criminal defendants have standing to assert not only the violation of their own rights but also the violation of the equal protection rights of excluded venirepersons.

*Parker* set out the procedure to be followed in making a *Batson* challenge:

> First, the defendant must raise a *Batson* challenge with regard to one or more specific venirepersons struck by the state and identify the cognizable racial group to which the venireperson or persons belong. The trial court will then require the state to come forward with reasonably specific and clear race-neutral explanations for the strike. Assuming the prosecutor is able to articulate an acceptable reason for the strike, the defendant will then need to show that the state's proffered reasons for the strikes were merely pretextual and that the strikes were racially motivated.

836 S.W.2d at 939 (internal footnotes and citations omitted).[3] *Accord, State v. Edwards,* 116 S.W.3d 511, 526–28 (Mo. banc 2003).

*State v. McFadden,* 191 S.W.3d 648, 651 (Mo. banc 2006) ("*McFadden I*"), noted that one of the most telling and common means of showing pretext is by showing that similarly situated venirepersons are treated differently, stating:

> To show pretext, the defense **can present** "side-by-side comparisons" of venirepersons allegedly struck for racially discriminatory reasons with those who were allowed to serve. Evidence of pur-

---

**2.** For example, a recent study found that after *Swain,* but before *Batson,* "a decades-long policy of systematically excluding African Americans from jury service in criminal cases ... was [actually] codified in a training manual" in one Texas county. EQUAL JUSTICE INITIATIVE at 16. In 1968, a manual containing an article authored by a Texas prosecutor under the direction of his superiors in the district attorney's office outlined the reasoning for excluding minorities from jury service. The manual, titled "Jury Selection in a Criminal Case" was distributed to prosecutors and re-

mained in circulation until at least 1976. Its use was strongly condemned in *Miller–El v. Dretke,* 545 U.S. 231, 264, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (finding this manual in use post-*Batson* ).

**3.** Even after these decisions, however, a recent study by the Equal Justice Initiative reports that peremptory strikes still often are used to remove minorities from jury service. EQUAL JUSTICE INITIATIVE at 14–18.

poseful discrimination is established when the stated reason for striking an African–American venireperson applies to an otherwise-similar member of another race who is permitted to serve. *Id.* (emphasis added) (internal footnotes omitted).

■ While the presence of a similarly situated Caucasian juror usually is indicative of pretext, and for this reason sometimes has been referred to as "crucial," *see, e.g., State v. Taylor,* 18 S.W.3d 366, at 374–75 (Mo. banc 2000), proof of a similarly situated Caucasian juror is not required in order to make a successful *Batson* challenge. As the United States Supreme Court noted in *Miller–El,* 545 U.S. at 247 n. 6, 125 S.Ct. 2317, "A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable...." *McFadden II* similarly noted that the presence of an identical white juror is not required. 216 S.W.3d at 676.

■ The ultimate issue to be decided under *Batson* is whether defendant has shown pretext, not whether there is a similarly situated Caucasian juror. This Court, in stating that pretext is to be determined by looking at "the plausibility of the prosecutor's explanations in light of the totality of the facts and circumstances surrounding the case," *Parker,* 836 S.W.2d at 939, has made it clear that the trial court may not conclude the prosecutor acted without pretext merely because one or more common means of establishing the existence of pretext is not borne out by the record. *See also Batson,* 476 U.S. at 98, 106 S.Ct. 1712; *Miller–El,* 545 U.S. at 231–232, 125 S.Ct. 2317. There is rarely a simple litmus test for examining pretext. Rather, the trial court should take "into account a variety of factors" "[i]n determining whether the defendant has carried the burden of proof and established the

existence of purposeful discrimination." *Parker,* 836 S.W.2d at 939. *See also State v. Marlowe,* 89 S.W.3d 464, 469–70 (Mo. banc 2002).

■ This does not mean, however, that the trial or appellate court is permitted to peruse the record to find legitimate reasons why the potential juror might have been stricken. To the contrary, the issue of pretext is determined by the prosecutor's stated reasons for the strike at the time of the *Batson* inquiry. The trial and appellate courts cannot identify additional reasons why the prosecutor *could have* stricken the venireperson but rather must look at whether the reason or reasons given by the prosecutor are race-neutral and, if so, at whether the defendant has shown that the seemingly race-neutral reason or reasons are merely pretextual. *Miller–El,* 545 U.S. at 252, 125 S.Ct. 2317.

It would be error to conclude from the focus of some cases on the presence or absence of a similarly situated Caucasian juror that the presence of such a juror is necessary to find pretext. Emphasis (sometimes undue) on this single factor seems to have resulted from this Court's use of the word "crucial" in cases such as *Taylor,* 18 S.W.3d at 374–75. *See State v. Smith,* 5 S.W.3d 595, 597–98 (Mo.App. 1999); *State v. Roberts,* 948 S.W.2d 577, 601–02 (Mo.1997); *State v. Carter,* 889 S.W.2d 106, 108–09 (Mo.App.1994). While *Taylor* and other cases have turned on the presence of a similarly situated Caucasian juror, *see e.g., Miller–El,* 545 U.S. at 247, 125 S.Ct. 2317; *Edwards,* 116 S.W.3d at 525; *Parker,* 836 S.W.2d at 940; *State v. Antwine,* 743 S.W.2d 51, 65 (Mo. banc 1987), they have done so under the facts of each case. The lack of a similarly situated Caucasian juror is not dispositive.

■ Prior cases have identified a non-exclusive list of factors that may be

relevant in any particular case. For example, a court also should look at "[t]he degree of logical relevance between the proffered explanation and the case to be tried in terms of the kind of crime charged, the nature of the evidence to be adduced, and the potential punishment if the defendant is convicted...." *Parker*, 836 S.W.2d at 940. The prosecutor's "patterns of practice," *e.g.*, questions and explanations and history of pretextual strikes, may be relevant, *Miller–El*, 545 U.S. at 233–34, 253, 125 S.Ct. 2317; *Parker*, 836 S.W.2d at 940, as may both the prosecutor's "demeanor" while engaging with venirepersons, *Antwine*, 743 S.W.2d at 65, and the demeanor of excluded venirepersons. *Parker*, 836 S.W.2d at 940.[4] "Objective factors bearing on the state's motive to discriminate on the basis of race, such as the conditions prevailing in the community and the race of the defendant, the victim, and the material witnesses, are also worthy of consideration." *Id. See also Antwine*, 743 S.W.2d at 65.

■ The prosecutor's disproportionate number of strikes against other minority venirepersons and/or the number of minority venirepersons remaining after peremptory strikes in the case before the court, is significant. *Miller–El*, 545 U.S. at 240–41, 125 S.Ct. 2317. Not using *every* strike against African–Americans or other minorities does not necessarily demonstrate a lack of racial motivation as to the challenged strike or strikes—it merely shows a probability that *every* strike was not racially motivated.

■ Similarly, the fact a prosecutor has left one *or more than one* African–American or other minority on the jury does not insulate the prosecutor from a claim of pretext, nor does the fact that some strikes were used against Caucasian venirepersons or that there was no substantially similar Caucasian juror who was not stricken. *Parker*, 836 S.W.2d at 940; *see State v. Hunter*, 802 S.W.2d 201, 203 (Mo.App.1991). Therefore, while some prior cases have found no pretext after noting that a prosecutor failed to use all of his or her "challenges against blacks" as "relevant to show that race was not the motive for the use of peremptory strikes," *State v. Shurn*, 866 S.W.2d 447, 456 (Mo. banc 1993); *see also State v. Johnson*, 207 S.W.3d 24, 37 (Mo. banc 2006), these cases should not be understood to mean that tokenism will protect the prosecutor from a finding of pretext if the prosecutor's explanations of the challenged strike or strikes indicates pretext or if the disproportionate nature of the strikes does so. *See Miller–El*, 545 U.S. at 240–41, 125 S.Ct. 2317.

■ Indeed, "to hold that mere tokenism satisfied *Batson* would fly in the face of its purpose." *Hunter*, 802 S.W.2d at 203. Because equal protection rights extend to excluded venirepersons, *see Powers*, 499 U.S. at 409–11, 111 S.Ct. 1364, the racial composition of the jury is an ineffective shield against prosecutorial animus if even one venireperson is stricken for racially motivated reasons. *Parker*, 836 S.W.2d at 940.

■ Turning to the case at hand, the defense raised a *Batson* challenge arguing that B.T. had been stricken because he was African–American. As required by *Parker* and similar cases, the prosecutor then came forward with a reasonably specific and race-neutral reason for the strike, stating that he believed that B.T. had shown initiative by asking about the degrees ' of murder and that his concern about the lesser degrees of murder caused the prosecutor to think that he might be

4. *See* note 2.

lenient. It was then defendant's burden "to show that the state's proffered reasons for the strikes were merely pretextual and that the strikes were racially motivated." *Parker*, 836 S.W.2d at 939. Accord, *Taylor*, 18 S.W.3d at 371.

The only grounds for pretext raised by Tyrone below were that B.T. was stricken while a similarly situated Caucasian venireperson who asked a question about the death penalty, B.B., was not stricken, and that the prosecutor mistakenly stated that B.T. had initiated the conversation about degrees of murder whereas he was in fact prompted to do so by the prosecutor. This Court does not find the trial court's rejection of these allegations of pretext was clearly erroneous.

While Tyrone is correct that both B.T. and B.B. asked facially similar questions in response to a query from the prosecutor, the content of their statements varied in substance. When the prosecutor asked the venirepersons whether they could follow the court's instructions on the difference between first- and second-degree murder, B.T. responded by asking, "... [W]hen you say degree, what do you mean by that, First Degree, Second Degree?" Not quite understanding the prosecutor's somewhat obscure initial response, B.T. asked him to clarify it, saying—"I mean, is that like more of a harsher sentence?" This evoked a more detailed response from the prosecutor.

Conversely, when asked whether he had any thoughts about the day before's questions, B.B. asked:

> Yesterday we were talking. And I'm not talking about presumption of innocence here or anything like that. But the State is not asking for the death

penalty or it's been ruled out completely. And I'm trying, in my mind, to justify why if we determine that there was guilt in this case that we wouldn't be allowed to consider all possible punishment. Not that we would necessarily go for that, but why would we eliminate some of the punishment possibilities from the deliberation?

The prosecutor generally explained why the prosecutor might seek the death penalty in only certain types of murder cases and that the jury would not be involved in sentencing.

As is evident from the nature of B.T.'s and B.B.'s comments, the two are not comparable. While both showed some minor initiative by asking questions regarding punishment (albeit in both cases they did so in response to an invitation from the prosecutor to ask questions), B.T.'s comments showed confusion as to the difference between first-degree murder and lesser degrees of murder. While it is questionable whether this curiosity about the degrees of murder showed a tendency toward leniency as opposed to showing a proper desire to better understand the court's instructions, it is evident that B.B.'s question about the death penalty tended to show that he was interested in the higher degrees of murder. A reasonable prosecutor may have concluded from these facts that B.B. would be a more favorable juror for the prosecution than would B.T. Apparently, the defense thought so also; it used one of its peremptory strikes to remove B.B. from the jury after the prosecutor struck B.T.

Tyrone did not argue to the trial court that any of the other factors identified in the above cases [5] were present here, and the record does not demonstrate the exis-

---

5. *See, e.g., Miller–El*, 545 U.S. at 233–34, 240–41, 125 S.Ct. 2317; *McFadden I*, 191 S.W.3d at 651; *Edwards*, 116 S.W.3d at 526–28; *Par-* *ker*, 836 S.W.2d at 940; *Antwine*, 743 S.W.2d at 65.

tence of any of those indicia of pretext. Therefore, nothing in the record shows the prosecutor used inappropriate or subjective grounds such as the excluded venireperson's demeanor, occupation as a postal worker or similar factors to strike B.T. or other venirepersons. Neither has any evidence been presented that the prosecutor had an inappropriate demeanor, questioned minorities differently than he did Caucasians or had a history of pretextual strikes. While the judge below did find that the prosecutor's strike of another venireperson was pretextual in this case, the judge also found a strike by defense counsel to be pretextual, and defense counsel did not argue below, nor does he in this Court, that the prosecutor's strikes constituted a pattern of pretext or a ground for finding pretext as to B.T. This further shows that the trial court understood its obligation to disallow pretextual strikes but did not find the strike of B.T. to be pretextual. In addition, the defense did not claim below, and does not claim in this Court, that the prosecutor used a disproportionate number of strikes against minorities, engaged in mere tokenism or that other objective factors supporting pretext were present.

In sum, for all of the reasons stated above, and giving appropriate deference to the trial judge's ability to judge the credibility of the prosecutor's reasons, the trial court did not err in finding that the strike was race-neutral in "light of the totality of the facts and circumstances." *Parker*, 836 S.W.2d at 939. This Court is not "left with the definite and firm conviction that a mistake has been made." *McFadden II*, 216 S.W.3d at 675.

## V. CONCLUSION

For all of the reasons stated above, this Court finds that the evidence supported the jury's finding of deliberation beyond a reasonable doubt and that the trial court did not clearly err in finding that B.T. and B.B. were not similarly situated and that the prosecutor's strike of B.T. was race-neutral. The judgment is affirmed.

PRICE, C.J., RUSSELL, BRECKENRIDGE and FISCHER, JJ., concur.

TEITELMAN, J., dissents in separate opinion filed; WOLFF, J., concurs in opinion of TEITELMAN, J.

RICHARD B. TEITELMAN, Judge, dissenting.

The principal opinion provides an excellent synopsis of the courts' 130–year struggle to minimize racial bias in jury selection. During this time, the legal standards protecting the right of all jurors to serve gradually have grown more stringent for the simple reason that prior standards fell short. Yet, despite the fact that *Batson*[1] was decided nearly a quarter century ago, recent cases demonstrate that the bias still exists. Therefore, to this day, prosecutors attempt to justify peremptory strikes of black jurors based on inconsequential matters such as "crazy looking" hair or being employed by the United States Postal Service.[2] The persistence of bias in jury selection demands that the courts continue to enforce the promise of *Batson* vigorously. This is a close case and, as a result, I would ensure that Bateman's trial is conducted free of any taint of racially biased

---

1. *Batson v. Kentucky*, 476 U.S. 86 (1987).

2. *State v. McFadden*, 216 S.W.3d 673, 676 (Mo. banc 2007)(state unsuccessfully justified peremptory strike by noting a prospective juror's "crazy looking red hair"); *State v. Edwards*, 116 S.W.3d 511, 525–28 (Mo. banc 2003)(state unsuccessfully justified peremptory strike by noting a prospective juror worked for the post office).

jury selection. Therefore, I respectfully dissent from the principal opinion to the extent that it finds no *Batson* violation with respect to the state's peremptory strike of B.T.

The principal opinion notes, correctly, that while the presence of similarly situated white jurors is a crucial factor, it is not necessarily dispositive because the proper analysis of a *Batson* claim requires consideration of the totality of the circumstances. However, after recognizing that *Batson* requires a multi-factor analysis, the principal opinion focuses almost exclusively on a single factor—the conclusion that the black and white jurors at issue are not similarly situated. By focusing on this single factor, the principal opinion overlooks three suspect aspects of this case that, when considered together, indicate a strong likelihood that the state's justifications for striking juror B.T. were pretextual.

First, the state struck B.T. for the "sole reason" that B.T. allegedly asked about the different degrees of murder before the prosecutor asked the prospective jurors if they could follow the court's instructions. According to the state, B.T.'s "initiative" in raising the issue demonstrated that B.T. had a "more lenient bend" on matters of crime and punishment. The record conclusively refutes the factual basis for the prosecutor's justification. B.T. did not raise the issue on his own initiative; he was responding to a direct question by the prosecutor. In common discourse, few people would be persuaded by an argument premised on inaccurate facts. Therefore, when the factual basis underlying the prosecutor's explanation of a strike is demonstrably inaccurate, the explanation appears more like an after-the-fact justification.

Second, despite being fully apprised of B.T.'s supposed leniency, the state originally did not strike B.T. from the venire panel. Instead, the state struck B.T. after the trial court sustained Bateman's *Batson* challenge to another prospective black juror. The assertion that B.T. may exhibit leniency because he took initiative in asking about degrees of murder was apparently not a concern until the state was unsuccessful in attempting to strike a different black venireperson from the jury. The principal opinion notes this fact but does not account for it in considering the totality of the circumstances of this case. These circumstances detract substantially from the credibility of the state's explanation for striking B.T.

Finally, the principal opinion notes that the trial court previously rejected an earlier strike as pretextual and that this fact indicates the trial court was not hesitant to invoke *Batson*. No one is arguing that the trial court was unwilling to follow the law. The trial court's state of mind is not at issue. What is at issue is the prosecutor's state of mind; specifically, whether B.T. was stricken because of his race or because of a race-neutral reason that logically is related to assessing the evidence at trial. Accordingly, the fact that the trial court previously sustained a *Batson* challenge is most relevant to showing that, in this case, the prosecutor demonstrated a tendency to utilize pretextual peremptory strikes.

When the foregoing facts are considered, this Court is left with a factually inaccurate justification for a strike made only after the state unsuccessfully attempted to exercise a pretextual strike against another prospective black juror. Given these circumstances, I conclude that the state's justification for striking B.T. was pretextual. The *Batson* violation requires the judgment to be reversed and the case to be remanded.