

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD86601 |
| | ) | |
| JOHNATHAN L. BRADFORD, | ) | Opinion filed:  May 13, 2025 |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF
JACKSON COUNTY, MISSOURI
THE HONORABLE SARAH A. CASTLE, JUDGE**

Division Three:  W. Douglas Thomson, Presiding Judge, Karen King Mitchell, Judge and Thomas N. Chapman, Judge

Johnathan Bradford ("Bradford") appeals from his convictions and sentence entered by the trial court after a jury found Bradford guilty of murder in the second degree, armed criminal action, tampering in the first degree, abandonment of a corpse, and assault in the fourth degree.  Bradford raises three Points on Appeal. First, Bradford claims the trial court clearly erred in overruling his *Batson*[1] challenge to the State's peremptory strike of Venireperson 56.  Next, Bradford argues there was insufficient evidence to support his guilt for the offense of

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d. 69 (1986).

abandonment of a corpse. Finally, Bradford argues the trial court plainly erred in entering a conviction and sentence for abandonment of a corpse because it violated Bradford's right against self-incrimination. We affirm.

**Factual and Procedural Background[2]**

At the beginning of Summer 2020, Bradford was living with his step-daughter ("Step Daughter"). While Bradford was out of town, Step Daughter stole $2,000 from Bradford, causing an argument. During the argument, Bradford sent Step Daughter a message saying "if I had a gun, I would have killed you and your son." Step Daughter immediately contacted her son's father ("Victim"), and Victim helped her pay the money back. Bradford decided to move out of Step Daughter's house. He asked Victim to pick up Bradford's clothes from Step Daughter's house, and Victim did so.

On July 22, 2020, Bradford stopped by Victim's house to get his clothes. Bradford was at Victim's residence for a few hours with Victim's brother and two others before Victim arrived with his romantic partner ("Passenger"). Victim and Passenger got ready to leave and Bradford sought a ride to where he was staying that evening. Victim agreed and the group departed, with Victim in the driver's seat, Passenger in the front passenger seat, and Bradford in the rear seat.

Victim drove his truck to the area near the intersection of 40th Street and Tracy Avenue, where he stopped to allow Bradford to exit the vehicle. Bradford

---

[2] "On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict." *State v. Steidley*, 533 S.W.3d 762, 767 n.1 (Mo. App. W.D. 2017) (quoting *State v. Rice*, 504 S.W.3d 198, 200 n.3 (Mo. App. W.D. 2016)).

and Victim shared an exchange regarding the vehicle's child locks. Then, Bradford fired his weapon, striking Victim in the head, the cheek, and the shoulder. At the time Victim was shot, his truck was not in park, so it lunged forward into the van of an area resident ("Resident"). Upon the truck's collision with Resident's van, Passenger exited the truck while screaming, searching for help in the area. The commotion caused Resident to come outside, and at some point, Passenger also solicited the help of a neighbor ("Neighbor"). Bradford then exited Victim's truck.

Bradford pulled Victim out of the truck and Victim dropped to the ground. Neighbor called 911 and while on the phone, Neighbor asked Bradford if Victim had a pulse, and Bradford "told him no." Bradford then "ran and jumped into the driver seat of the truck" to leave the scene because, among other things, he was a convicted felon with money and drugs in his possession. Prior to leaving the scene, Bradford ran over Victim's body "two or three times." Bradford also hit Neighbor with Victim's truck, pinning him to a vehicle, and causing him to suffer scrapes, scratches, and other minor injuries.

Bradford was ultimately arrested and charged by information with the class A felony of murder in the second degree, the unclassified felony of armed criminal action, the class D felony of tampering in the first degree, the class E felony of abandonment of a corpse, one count of misdemeanor assault in the fourth degree,

3

and two counts of the class D felony of unlawful possession of a firearm.[3]  His trial commenced on June 9, 2023.

During *voir dire*, Bradford's counsel asked the venire panel whether they would believe a law enforcement officer's testimony over conflicting testimony from a convicted felon.  One venireperson provided an extensive answer, after which Bradford's counsel asked "Okay.  So simplifying that a lot, you say that due to an officer's training and experience in recollecting evidence, you'd be more likely to believe the officer than a lay witness?"  The venireperson agreed, and when the rest of the venire panel was asked if they agreed, Venireperson 61 raised his card.

Toward the end of his questioning to the venire panel, Bradford's counsel also asked the venire panel if any of them had not yet spoken to Bradford's counsel or the State.  Among those who raised their hands were Venireperson 56, who was African American, and Venireperson 61, who was Caucasian.  Bradford's counsel asked Venireperson 56 if anything that Bradford's counsel had said made venireperson 56 think "hey, maybe I can't be fair and impartial in this case?"  Venireperson 56 responded: "No."

---

[3] Prior to the start of Bradford's trial, the trial court ordered Counts VI and VII (both for felonious unlawful possession of a firearm) to be severed from the rest of Bradford's charges. On September 12, 2023, Bradford was sentenced for all seven counts. However, the severed charges and their corresponding sentences were not made a part of Bradford's appeal.  Therefore, the two counts for unlawful possession of a firearm are not relevant to this appeal.

Bradford's counsel then questioned Venireperson 61, asking Venireperson 61 if he had heard anything that made him think he would not be able to be fair and impartial. Venireperson 61 responded: "No." This led to a lengthier exchange:

[Bradford's counsel]: Okay. If the State puts on all their evidence and you think that he might be guilty, but there's still some reasonable doubt, are you willing to find Mr. Bradford innocent?

Venireperson 61: I'd like to probably hear what he had to say.

[Bradford's counsel]: I'm sorry. I didn't hear you.

Venireperson 61: I'd want to hear both sides completely before I say anything else.

[Bradford's counsel]: Okay. So are you a person that would say like, hey, if you were innocent, you're going to tell your story?

Venireperson 61: Oh, no.

[Bradford's counsel]: Okay. So you agree there are reasons why someone might not want to testify?

Venireperson 61: Yes.

[Bradford's counsel]: But if Mr. Bradford decides, hey, it's better for me not to testify in this situation, are you going to weigh that against him when you're determining guilt or innocence?

Venireperson 61: No.

During the jury selection conference, the trial court asked a question of the State regarding Venireperson 61:0

So I have a question on 61 because 61 raised his card at one point and said he would believe an officer more over a convicted felon, but then when asked if he had ever raised his car[d], he responded no. And then you called on him and you asked him his follow-up, and he's like nothing has caused me to believe that I couldn't be fair and impartial. I can follow the instructions.

Bradford's counsel responded that Venireperson 61 "told me two things that were completely contradictory and one was like definitely struck [sic], and then he said I definitely would be fair." The trial court added that "the wrap up was anything you have heard that would make you not be fair and impartial, he said no." The parties then moved on to discussing a different venireperson. Neither party requested the trial court strike Juror 61 for cause; nor did either party peremptorily strike Juror 61.

The State used its first peremptory strike from the alternate pool to strike venireperson 56. Bradford's counsel objected to this peremptory strike on *Batson* grounds, alleging that venireperson 56, who was African American, was struck because of his race. Counsel for the State responded to this objection by stating the State's reason for striking venireperson 56: "[H]e had not answered any of the questions that were asked until the very end. So that was the basis for striking him. We quite frankly, I mean, that was our basis." Bradford's counsel alleged that the State's reason for striking venireperson 56 was merely a pretext for racial discrimination because there was a similarly situated Caucasian venireperson who was not struck from the panel (Venireperson 61). The trial court found:

> The *Batson* challenge will be overruled. The Court finds that the objecting party has raised the issue of discrimination, identified the group with which the venireperson may belong. The State has provided a reasonably specific race neutral explanation for the strike and the proffered explanation does not establish that the State's reason is merely a pretext for discriminatory motives and that is why the [court] will reverse [sic] the *Batson* challenge at this time.

The jury was then seated and trial commenced.

The jury found Bradford guilty of murder in the second degree (Count I), armed criminal action (Count II), tampering in the first degree (Count III), abandonment of a corpse (Count IV), and assault in the fourth degree (Count V). On September 12, 2023, Bradford was sentenced to: life on Count I for murder in the second degree to run concurrent with five years on Count II for armed criminal action, seven years on Count III for tampering in the first degree to run concurrent with seven years on Count IV for abandonment of a corpse, and one year on Count VII for assault in the fourth degree.[4]  This appeal follows.

## Point I: *Batson* Challenge

Bradford's first point on appeal argues the trial court clearly erred in overruling his *Batson* challenge to the State's peremptory strike of Venireperson 56.  Bradford contends that he established that the State's proffered reason for the strike of Venireperson 56, who is African American, was merely pretext for racial discrimination because the State failed to strike a similarly situated Caucasian venireperson.  We disagree.

We review a trial court's findings on a *Batson* challenge for clear error.  *State v. Boyd*, 597 S.W.3d 263, 268 (Mo. App. W.D. 2019) (citing *State v. Meeks*, 495 S.W.3d 168, 172 (Mo. banc 2016)).  Thus, "we accord 'great deference' to the circuit court 'because its findings of fact largely depend on its evaluation of credibility and demeanor.'" *State v. Evans*, 490 S.W.3d 377, 384 (Mo. App. W.D. 2016) (quoting

---

[4] The sentence for Count VII was to run concurrently with the sentences for Counts III and IV, and the concurrent sentences for Counts I and II were to run consecutively to the sentences imposed to run concurrently for Counts III, IV, and VII.

*State v. Bateman*, 318 S.W.3d 681, 687 (Mo. banc 2010)). "To find [the trial court's decision] was clearly erroneous, we must have a 'definite and firm conviction that a mistake has been made.'" *State v. Gilbert*, 628 S.W.3d 702, 707 (Mo. App. W.D. 2021) (quoting *Bateman*, 318 S.W.3d at 687).

The Equal Protection Clause of the Fourteenth Amendment prohibits peremptory challenges to be made to remove "potential jurors solely on account of their race." *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The Missouri Supreme Court established a burden-shifting test ("*Parker* test") for determining whether a challenged peremptory strike runs afoul of the Equal Protection Clause:

> First, the defendant must raise a *Batson* challenge with regard to one or more specific venirepersons struck by the state and identify the cognizable racial group to which the venireperson or persons belong. The trial court will then require the state to come forward with reasonably specific and clear race-neutral explanations for the strike. Assuming the prosecutor is able to articulate an acceptable reason for the strike, the defendant will then need to show that the state's proffered reasons for the strikes were merely pretextual and that the strikes were racially motivated.

*Meeks*, 495 S.W.3d at 172-73 (Mo. banc 2016) (quoting *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992) (citations and footnote omitted)).

Bradford challenges only the last step of the *Parker* test, alleging that the trial court clearly erred when it concluded that Bradford failed to demonstrate that the State's proffered reason for exercising a peremptory challenge to strike Venireperson 56 was merely pretextual and was instead racially motivated.

The record clearly demonstrates that the trial court satisfied the first two prongs of the *Parker* test. First, Bradford met his burden by raising a race-based

8

*Batson* challenge to the State's peremptory strike of Venireperson 56 from the alternate pool. The burden then shifted to the State, which met its burden by responding:

> Judge, I believe the reason that we had chosen to strike [Venireperson] 56 was because he had not answered any of the questions that were asked until the very end. So that was the basis for striking him. We quite frankly, I mean, that was our basis . . . There were no other [venirepersons] in the alternate pool that did not speak. [Venirepersons] 57, 58, and 61 all answered questions.

The burden then shifted back to Bradford to establish that the State's explanation was pretextual and that the strike was indeed racially motivated. *See State v. Jackson*, 636 S.W.3d 908, 917 (Mo. App. W.D. 2021) (quoting *Gilbert*, 628 S.W.3d at 708) ("[T]he party challenging the peremptory strike has the burden to 'present evidence or specific analysis showing that the proffered reason was pretextual.'"). Bradford's argument was that Venireperson 61 was a similarly situated Caucasian venireperson that was not stricken by the State. The parties had a lengthy exchange on this matter:

> [BRADFORD'S COUNSEL]: I think both 61 and 56 both raised their cards when I asked if no one had answered – if I hadn't spoken to anyone today. And I think they are both in the same situation. And the one that got struck is the one that is African-American.
>
> [STATE'S COUNSEL]: I don't think that. I would not consider them to be in the same situation. I think [Venireperson] 62 gave way more information.
>
> THE COURT: [Venireperson] 61?
>
> [STATE'S COUNSEL]: Sixty-One, excuse me, gave way more information when questioned that [*sic*] [Venireperson] 56.

9

[BRADFORD'S COUNSEL]: Judge that has a lot to do with my follow-up questions. The way that 61 asked – or answered – questions, led me to dig further in, which got me talking to him. Fifty-six I asked questions, he answered yes or no, and that was it.

[STATE'S COUNSEL]: And that's fine if the reason was because of the follow-up questions. The reason, I guess, doesn't – is not my basis. It is just the fact that we have more information about 61. He gave us information, he specifically said that he would –

THE COURT: He said initially he would weigh an officers [*sic*] credibility over that of another person, which would have struck him.

[STATE'S COUNSEL]: He raised his card, and then he was rehabilitated at the end. I also believe he had a conversation at the end about preferring to hear from both sides; however, he would not hold it against the defendant if he decided not to testify.

We didn't get any information about anything even remotely detail[ed] like that from [Venireperson] 56.

[BRADFORD'S COUNSEL]: The last thing and the only thing I will add is that there was a conversation before we went into chose [*sic*] our premptory [*sic*] strikes where we talked about how 61 had waffled back-and-forth and was a concern, but didn't rise to the level of strike for cause, and the State still chose 56 over 61.

[STATE'S COUNSEL]: That's, I guess, my point. This isn't a struck for cause. It's a premptory [*sic*] strike. If [Venireperson] 61 is a concern for the defendant, then it would favor, we believe, it would favor the State. And not to the point of rising to a strike for cause, but that is why we chose to keep him.

And Judge, if it helps, [Venireperson] 58, the reason we chose to keep him, he also made similar comments about it would not make you more likely to convict if the defendant did not testify; however, he seems like that might be relevant information to him. We believe that was a favorable answer to the State and so we chose to keep him.

. . .

THE COURT: Can you explain to me again, why you think that is pre-textual?

. . .

10

[BRADFORD'S COUNSEL]: [Venireperson 56] said he could be fair and impartial, the other ones [*sic*] kind of waffled a bit. We even discussed that with the State. That didn't rise up to a level of cause. [Venireperson] 56 never even came close to that, he didn't have much to say admittedly, but it seems like it was only race based so that is why we are objecting to it.

The trial court then overruled Bradford's *Batson* challenge, finding that "the proffered explanation does not establish that the State's reason is merely a pretext for discriminatory motives[.]"

"In determining whether the defendant has carried the burden of proof and established the existence of purposeful discrimination, . . . [t]he chief consideration should be the plausibility of the prosecutor's explanations in light of the totality of the facts and circumstances surrounding the case." *Parker*, 836 S.W.2d at 939. "This Court considers a non-exclusive list of factors in determining whether pretext exists, including: 'the explanation in light of the circumstances; similarly situated jurors not struck; the relevance between the explanation and the case; the demeanor of the state and excluded venire members; the court's prior experiences with the prosecutor's office; and objective measures relating to motive.'" *Gilbert*, 628 S.W.3d at 708 (quoting *State v. McFadden*, 369 S.W.3d 727, 739 (Mo. banc 2012)). "[T]he exercise of peremptory challenges is the product of the subjective analyses of a wide variety of character and personality traits perceived by counsel. *Batson* does not prohibit 'hunch' challenges so long as racial animus is not the motive." *Gilbert*, 628 S.W.3d at 709 (quoting *State v. Antwine*, 743 S.W.2d 51, 67 (Mo. banc 1987)) (alterations in original). "Because weighing the legitimacy of the State's explanation for a peremptory strike is, by nature, a subjective exercise, 'we

11

place great reliance in the trial court's judgment.'" *State v. Brown*, 246 S.W.3d 519, 525 (Mo. App. S.D. 2008) (quoting *State v. Morrow*, 986 S.W.2d 100, 114 (Mo. banc 1998)).

Bradford argues, as he did during *voir dire*, that the State's proffered reason for striking Venireperson 56 was implausible because there was a similarly situated Caucasian venireperson, Venireperson 61, who was not struck. Bradford contends that the point of view he provided was nowhere near as serious as the conflicting answers provided by Venireperson 61, suggesting Venireperson 61's responses regarding "important subjects such as officer vs. lay person credibility and a defendant's right not to testify" should have been *more* concerning to the State than Venireperson 56's short, yet clear, answer.

Initially, we note that Bradford's argument misses the State's rationale for the strike of Venireperson 56 and not Venireperson 61. Though various portions of Venireperson 61's responses could be perceived both as beneficial and detrimental to the State, this venireperson was *open* in making such responses. This, compared to Venireperson 56's *lack* of response is telling. The State had *some idea* of Venireperson 61's thoughts, while having *no idea* as to the thoughts of Venireperson 56. It is evident the State was concerned with potential jurors who barely contributed to the discussion in voir dire, which is a valid, race-neutral ground for exercising a peremptory strike. *See State v. Ware*, 326 S.W.3d 512, 521 (Mo. App. S.D. 2010) (quoting *State v. Barnett*, 980 S.W.2d 297, 302 (Mo. banc 1998)) ("[A] venireperson's silence can provide a valid, race-neutral reason for

being peremptorily struck. 'The state should not be required to take a risk on a prospective juror about whom little information is known.'") (internal citations omitted). In short, Bradford's comparison of Venireperson 56 to Venireperson 61 is misplaced because their responses were simply not the same. *See Bateman*, 318 S.W.3d at 692 (finding two venirepersons were not comparable when the substance of their answers led to different inferences about each venireperson's disposition).

Moreover, Bradford's argument regarding Venireperson 56 ignores the State's clear pattern of striking members of the venire panel who remained largely silent during *voir dire*, giving the parties virtually no insight into their dispositions. To that end, along with Venireperson 56, the State peremptorily struck Venirepersons 11 and 55 for the same reason – the State lacked insight regarding these venirepersons dispositions due to their silence. The State's peremptory strike of Venireperson 11 was challenged on *Batson* grounds, such challenge being denied. The State's peremptory strike of Venireperson 55 was not challenged.[5] In making these peremptory strikes, the State demonstrated a consistent concern with members of the venire panel who remained largely silent because the State considered those venirepersons to be unpredictable. We are persuaded that the trial court was able to observe the State's demeanor and preferences throughout *voir dire*, and found that the State's proffered race-neutral reason for striking Venireperson 56 was consistent with the State's decision to strike other similarly-

---

[5] The race of Venirepersons 11 and 55 is unknown.

13

situated members of the venire panel. *See Id.* at 691 ("The prosecutor's 'patterns of practice,' *e.g.*, questions and explanations and history of pretextual strikes, may be relevant[.]") (internal citations omitted).

The trial court properly rejected Bradford's argument that the State's race-neutral reason for striking Venireperson 56 was merely pretextual. Not only did the trial court properly reject Bradford's faulty comparison of Venirepersons 56 and 61, but it also observed the State's demeanor in questioning and observing the venire panel during *voir dire*, its consistent considerations when striking members from that panel, and the reasonableness of the race-neutral explanation for striking Venireperson 56 in light of the totality of the circumstances. The State sufficiently articulated an acceptable reason in response to Bradford's *Batson* challenge.[6] The trial court did not clearly err when it overruled Bradford's *Batson* challenge to Venireperson 56.

**Point II – Sufficiency of the Evidence (Abandonment of a Corpse)**

In his second Point on Appeal, Bradford argues the trial court erred in entering a conviction for abandonment of a corpse. Bradford's specific contention

---

[6] Venireperson 56 was a potential alternate juror. The alternate jurors participated in deliberations in this case. We recognize the Eastern District of this Court's holding: "*Batson* does not stand for the proposition there is a Constitutional right to be an alternate juror." *State v. Carter*, 889 S.W.2d 106, 109 (Mo. App. E.D. 1994). However, because this Court finds that the strike of Venireperson 56 was not based on race, it need not address the matter further. *See Id.* at 692 n.2 (Mo. banc 2013) (declining to address the argument that the strike of an alternate juror is immaterial when the *Batson* challenge was properly overruled on the merits); *see also Goodman v. Holly Angle, LMT*, 342 S.W.3d 458, 464 (Mo. App. W.D. 2011) (declining to address whether *Batson* applies to an alternate juror when "a review of [the] point on the merits demonstrates that the circuit court did not err in overruling the challenge.").

14

is that the State's evidence was insufficient to prove Bradford knew or was aware that Victim was deceased when Bradford left the scene. We disagree.

To determine whether there was sufficient evidence to support a criminal conviction, we seek to determine "whether or not there was sufficient evidence from which the trier of fact could have reasonably found guilt." *State v. Besendorfer*, 439 S.W.3d 831, 834 (Mo. App. W.D. 2014) (citing *State v. Sladek*, 835 S.W.2d 308, 310 (Mo. banc 1992)). "In applying this standard, we accept all evidence and inferences favorable to the judgment as true, and we disregard all . . . inferences to the contrary." *State v. Hicks*, 526 S.W.3d 273, 275 (Mo. App. W.D. 2017) (citing *State v. Vandevere*, 175 S.W.3d 107, 108 (Mo. banc 2005)). We will not disturb a conviction so long as "a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Weaver*, 481 S.W.3d 927, 930 (Mo. App. W.D. 2016) (quoting *State v. Neal*, 328 S.W.3d 374, 378 (Mo. App. W.D. 2010)).

"A person commits the crime of abandonment of a corpse if that person abandons, disposes, deserts or leaves a corpse without properly reporting the location of the body to the proper law enforcement officials in that county." *Scroggs v. State*, 655 S.W.3d 210, 219 (Mo. App. W.D. 2022) (quoting Section 194.425[7]). "Section 194.425 [abandonment of a corpse] does not specify the mental state necessary for the commission of the crime. Where that is so, section

---

[7] All statutory references are to RSMo 2016 as supplemented through Jan. 1, 2017, unless otherwise indicated.

561.021, requires the prosecution to show [the defendant] acted 'purposely or knowingly.'" *State v. Bratina*, 73 S.W.3d 625, 628 (Mo. banc 2002). "The questions are whether [the defendant] knew the [deceased person] was dead and whether [the defendant] intended, at that point, to abandon [the deceased's] body." *Id.* Those questions will be answered by the jury as the finder of fact. *Id.* at 628-29.

Bradford's appeal does not challenge the sufficiency of the evidence to convict him of any of the other charges. Thus, Bradford implicitly acknowledges the jury was reasonable in concluding that he shot Victim in the head, cheek, and shoulder at point blank range, causing Victim to die. This explains why Bradford challenges only the sufficiency of the evidence to support the jury's answer to the first question; whether Bradford knew Victim was dead when he abandoned Victim's body. Bradford argues the State presented no evidence that Bradford knew Victim was deceased. Bradford's argument fails, however, because under our standard of review, we will affirm so long as a reasonable juror could have found that Bradford knew Victim was deceased when he left the scene.

Bradford admitted that he dropped Victim's body from the seat of a pickup truck, after Victim had suffered three gunshot wounds, including the aforementioned head wounds. In fact, Bradford referred to Victim as "dead weight." Most telling, after dropping Victim's body, Bradford checked Victim for a pulse. Bradford testified that then "[Neighbor] asked me did [Victim] have a pulse and I told him no[.]" Bradford knew then, that Victim, having no pulse, was

deceased. Bradford then acknowledged he was aware Neighbor was on the phone with 911 at this time, leading to the logical inference that it was his voice on the recorded 911 call stating Victim had no pulse, the same 911 call played for the jury. After such statement, Bradford stepped into the pickup truck with the intention to leave. Due to the forceful collision with a parked van after Victim, the truck's driver, was shot, "the truck was essentially stuck onto the van." In an effort to leave the scene, Bradford then "revved the engine" and "maneuvered -- wiggled the wheel and then hitting [*sic*] the accelerator until the truck broke free." In doing so, Bradford drove the pickup truck over Victim's body two or three times. This, when taken together, provides a sufficient basis from which a reasonable juror could have concluded that Bradford knew Victim was deceased when Bradford failed to contact law enforcement and instead left the scene and Victim's body.

Bradford urges us to focus on his belief that medical attention was on its way to assist Victim when he left the scene. Under our standard of review, however, we must disregard any evidence contrary to the verdict. *See, e.g., State v. Bumby*, 699 S.W.3d 459, 466 (Mo. App. W.D. 2024). The jury, as fact-finder, was entitled to reject Bradford's self-serving testimony that he believed Victim was still alive when he left the scene. *See, e.g., State v. Shaddox*, 598 S.W.3d 692, 694 n.2 (Mo. App. S.D. 2020) (disregarding self-serving testimony contrary to the jury's verdict on appeal). It is evident, however, that the jury gave great weight to Bradford's statement that he had checked for the Victim's pulse, and found none. This, after

17

Victim had suffered two gunshot wounds to the head, and just prior to being run over by Bradford at least twice.

Because we find that a reasonable fact finder could have concluded that Bradford knew Victim was dead when he left the scene, Point II is denied.

## Point III: Violation of Right Against Self Incrimination

Bradford's third Point on Appeal alleges that the trial court plainly erred in entering a conviction for abandonment of a corpse because it violated his right to due process and against self-incrimination. Bradford argues the State cannot use the abandonment of a corpse statute to require Bradford to report a crime where doing so could reasonably lead to Bradford's prosecution for second degree murder. Bradford argues this violated his rights because it required either self-incriminating testimony or an officially coerced self-accusation.

Thus, for the first time on appeal, Bradford argues that the abandonment of a corpse statute is unconstitutional as applied to him. However, Bradford "waived this argument by not raising the alleged unconstitutionality of the law at the earliest opportunity." *See McGathey v. Davis*, 281 S.W.3d 312, 318 (Mo. App. W.D. 2009) (declining to find a statute unconstitutional when that issue was argued first on appeal). "The earliest opportunity to raise a constitutional challenge to the [application of the] charging statute is by a pretrial motion to quash the indictment." *State v. Cerna*, 522 S.W.3d 373, 382 (Mo. App. E.D. 2017). "An attack on the constitutionality of a statute is of such dignity and importance that the record touching such issues should be fully developed and not raised as an

18

afterthought in a post-trial motion or on appeal." *McGathey*, 281 S.W.3d at 318 (quoting *Hollis v. Blevins*, 926 S.W.2d 683, 684 (Mo. banc 1996).

Bradford was aware on September 4, 2020, when indicted, that he was charged with abandoning a corpse in violation of Section 194.245. Thus, when Bradford was tried and convicted of such charge in June 2023, it could hardly have been a surprise. Bradford had ample opportunity to challenge the constitutionality of the application of the charging statute for abandonment of a corpse but failed to do so at the earliest possible opportunity. It is thus improper and unnecessary for this court to determine whether Bradford's constitutional challenge is meritorious. We decline plain error review.

Point III is denied.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.

19