### STATE of Missouri, Respondent,

### v.

### Bryan David HILTIBIDAL, Appellant.

### No. WD 69620.

Missouri Court of Appeals, Western District.

Aug. 18, 2009.

Margaret M. Johnston, Columbia, MO, for appellant.

Shaun J. Mackelprang and Jayne T. Woods, Jefferson City, MO, for respondent.

Before THOMAS H. NEWTON, C.J., P.J., JAMES M. SMART, JR., and MARK PFEIFFER, JJ.

JAMES M. SMART, JR., Judge.

Bryan Hiltibidal appeals his conviction of second-degree domestic assault. He complains on appeal about the failure to submit a self-defense jury instruction and the admission of evidence. The judgment is reversed, and the matter is remanded.

## Facts

This case revolves around a physical altercation between Bryan Hiltibidal and his girlfriend, Katherine Smith.[1] The altercation occurred on July 26, 2006, inside Smith's residence, which they occupied together at that time. Hiltibidal was charged with second-degree domestic assault, section 565.073, for recklessly causing serious physical injury to Smith by hitting and kicking her at a time when they resided together.

At trial, Hiltibidal and Smith told differing versions of what occurred that evening. We set forth both versions, because the issue to be decided here requires that we consider the evidence in a light favorable to the defense.

### A.  The Version of Ms. Smith

According to Katherine Smith, they were drinking alcohol and began arguing. She testified that while she was seated in a chair, Hiltibidal grabbed her shoulders, pulled her out of the chair, and threw her on the carpeted floor.

She said he began hitting her on the sides of her head with both of his fists. Smith tried to cover her head. Hiltibidal kicked Smith in her ribcage while she was face down on the floor and stomped on her fingers.

She testified that he turned her over, grabbed her by the throat, and picked up a hammer that was in the room. Smith said that Hiltibidal swung the hammer back, and she begged him not to hit her. He put the hammer down and asked her for the keys to her Jeep. Smith said she initially refused to comply, but then decided to comply so that he would leave. Smith told Hiltibidal that if he did not return the Jeep in a couple of days, she would report it as stolen. Smith testified that Hiltibidal pulled out all of the phone wires. He took the keys and left. Smith said she got into her other vehicle and tried to drive to the emergency room. Smith went instead to get help from a neighbor because she was having trouble breathing. The neighbor took Smith to the hospital, where she was diagnosed with three broken ribs, swollen fingers, and other injuries.

---

1.  This opinion uses a substitute name for the victim ("Katherine Smith").

Smith was hospitalized for three days with the broken ribs. Smith missed three weeks of work and was limited to light duty for an additional six weeks. At the time of trial, she said she was still in pain from the rib injuries and had shortness of breath.

At trial, Hiltibidal took the witness stand and testified in his own defense.

## B. The Version of Defendant

Hiltibidal said that on the evening in question, he got home before Smith did. He says he told Smith that he was leaving and taking "his" Jeep. He said that "everyone" knew the Jeep was his (although titled in her name), because he was making the payments. He further testified:

A. I walked into the bathroom and I came back out and I went to the table and I had some pocket money there, I had my wallet there and my Jeep key.

. . . .

Q. Well, anyways, so you went back into the kitchen; is that right? Is that what you said?

A. Yes, sir, I went past the table—

Q. And what happened then?

A. —to get my wallet and my money. And the Jeep key was gone.

. . . .

A. I said, Where's my key, [Katherine]? She didn't say nothing. She reached down in the icebox grabbing a Busch out of the thing. And she turned around. I said, [Katherine], give me my key. She said, The only way that you're leaving here is with your prison clothes, what I came with. And—

Q. And can you tell us what happened then?

A. I said, Just give me my key, [Katherine]. And when I looked down at my hand, she bashed the beer bottle over my head.

Q. Okay.

A. And everything kind of went dizzy. And then she came back and she hit me with a straight punch right in my mouth, grabbed me right around my throat with her nails. After she did that, I grabbed her around her throat and I slammed her up against the icebox. I said, This—this is the crap that I'm talking about. I said—I said, This is the stuff that I'm talking about. And she's like, You unappreciative SOB. I give you a place to stay and this is how you treat me. I said, [Katherine], please just give me my key and let me go. I said, Just—

Q. Well, what happened then?

A. I took my hand down off her throat and I kind of had her up against the icebox like that (indicating). And I'll admit that when I did that, it kind of took a little wind out of her. I said, [Katherine], just give me my keys. She said, You can have your damn keys. I said, Well, where is it? And I stepped up off of her like this (indicating). She said, It's in the computer room. So I said, Let's go get my key. So we walked into the computer room. And in the computer room there's a big chair and it's just kind of like a circle room set-up and—

. . . .

Q. So you went into the computer room. What happened then?

A. Oh, she said—she reached down on the side of the easy chair like this (indicating). And when she did, she came around a full motion again and came at me and tried to scratch my eyeballs out. She hit me right here across my forehead (indicating) with one nail. And at that time I went down like this and lowered my head and she ran smack—head-butted like that (indicating). At

the time that she did that, that's when I lowered down and I hit her three times in the ribs with my left hand. She dropped to the ground. She said, Ooooh. You know, she said, I can't breathe, I can't breathe. I said, I know you can't breathe because I just hit you in your ribs. I said, I ought to tie you up and leave you here like that. And I don't know anything about no hammer. But anyway, I turned her over and she had the key in her pocket the whole time, you know. Anyway, I turned her over, took her like this (indicating) and I drug her all the way into the living room and I sat her up against the coffee table like that. I said, [Katherine], because of this, I said, I'm probably going to end up going back to jail, you know. I said, Please just give me my key and let me go. She reached in her pocket, she took the Jeep key out of her pocket and threw it at me. I caught the Jeep key. She said, Take the Jeep and get out of here. She says, I'll tell somebody they just jacked me for the Jeep. I got in the Jeep, I drove out—I drove up to the sawmill, parked in the sawmill and that's what happened that night.

Hiltibidal testified that the physical altercation began when Smith "bashed" a beer bottle over his head. Once they moved to the computer room, the physical altercation resumed when she came at him and tried to "scratch" his "eyeballs out." On cross-examination, Hiltibidal stated he was in a "defensive mode" and was trying to leave the situation. He denied pulling out the phone lines. He testified that, before he left, he offered to take her to the hospital, and when she declined, he brought her the phone so she could call for help.

Hiltibidal further testified that he drove to work, cleaned his wounds, and obtained a check from his boss so he could go to a chiropractor. Instead of going to the chiropractor, he cashed the check and left the State of Missouri because he knew he would probably get in trouble.

On cross-examination, Hiltibidal denied that he hit Smith at any time other than slamming her "against the icebox" and hitting her three times in the ribs with his "left hand." He admitted that he and Smith had fought before but denied that the prior fights had turned physical. Hiltibidal testified that on one occasion Smith had punched him in the head and knocked him out of a chair because he bumped into her grandmother's knickknack shelf. Hiltibidal also testified that Smith smacked him in the mouth another time when they were camping. Smith had, he said, been drinking on both occasions.

A deputy sheriff testified that he interviewed Hiltibidal after Hiltibidal was in custody, approximately two or three months after the incident. Hiltibidal said at that time that he and Smith had gotten into an argument and that she had hit him with a bottle as he was trying to leave. He denied choking or beating her but admitted that he grabbed her by the throat and pushed her up against the refrigerator. On that occasion, Hiltibidal denied that he hit Smith.

The jury found Hiltibidal guilty. Hiltibidal appeals.

### Analysis

Hiltibidal claims that the trial court plainly erred in failing to instruct on self-defense, because there was substantial evidence putting it in issue. Section 563.031 provides, *inter alia*, that a person may use "physical force upon another person when and to the extent he reasonably believes such force to be necessary." He argues that the failure to give a self-defense instruction violated his rights to due process of law, to present a defense, and to a fair

trial before a fairly-instructed jury. He maintains that the error resulted in manifest injustice because there was substantial evidence that he did not provoke Smith's attacks; he reasonably believed he was faced with the necessity of defending himself from serious bodily harm because Smith hit him on the head with a beer bottle leaving a dent and glass in his head. He said she struck him, she attempted to scratch his eyes out, and she "head-butted" him causing him to lose a tooth. Hiltibidal states that he used no more force than was necessary to protect himself from serious bodily injury. He says he responded to the attack only "in a defensive mode" since he could not see what was happening as a result of being struck on the head. Hiltibidal claims he did all that was possible to avoid the danger. He said it was only after Smith's second unjustified attack that he hit her three times in the ribs in a "defensive mode" since he thought it was the best way he could avoid any more injuries and leave.

■ Hiltibidal admits that at trial he failed to request a self-defense instruction. Here, the claim is that the court failed to instruct on self-defense. The law requires that the court do so *sua sponte* when the issue is raised by the evidence. Thus, regardless of whether defendant requested the instruction at trial, if "substantial evidence" is presented to support the giving of an instruction on self-defense, it is error to fail to give the instruction. *See State v. Avery,* 120 S.W.3d 196, 200 (Mo. banc 2003).

■ The elements of self-defense allowing the infliction of serious bodily harm require a showing that the defendant: (1) did not provoke the attack nor was he the aggressor, (2) reasonably believed that he was faced with the necessity of defending himself from serious bodily harm, (3) used no more force than was necessary, and (4) attempted to avoid the confrontation. *See*

*State v. Delgado,* 774 S.W.2d 549, 552 (Mo. App.1989); *State v. White,* 222 S.W.3d 297, 300 (Mo.App.2007).

■ Self-defense is included in the MAI–CR3d 306.00 series entitled "INSTRUCTIONS REQUIRED WHETHER REQUESTED OR NOT." "A jury instruction on self-defense is required when substantial evidence is presented to support it." *White,* 222 S.W.3d at 300. "The trial court must give the instruction regardless of whether the evidence supporting the justification defense is inconsistent with the defendant's testimony or theory of the case." *Id.* "The instruction also must be given regardless of whether it was requested." *Id.* Failure to submit a self-defense instruction will generally constitute reversible error if the defense was supported by the evidence. *Id.*

■■ "In considering whether the trial court erred in failing to instruct the jury on a justification defense, we view the evidence in a light most favorable to the defendant." *Id.* "If the evidence tends to establish a theory of self-defense, or supports differing conclusions, the instruction must be given." *Id.* "This is because any conflict in the evidence is to be resolved by a jury properly instructed on the issues." *Id.*

■ The State argues that Hiltibidal used "deadly force" on Smith and that his testimony did not support the "apparent necessity" for Hiltibidal to save himself from "an immediate danger of serious bodily injury." The State notes that Hiltibidal suffered only minor injuries. While it may be tempting to reject Hiltibidal's testimony as implausible in suggesting that he needed to inflict three broken ribs on Smith as well as giving her a head injury, we must leave the credibility of his testimony to the jury.

As already mentioned, we are to consider the evidence in a light favorable to the

defendant. *Id.* Hiltibidal testified that Smith bashed him on the head with a beer bottle in one room and then attempted to "gouge out his eyes" in another room. He testified that Smith was acting under the influence of alcohol. This testimony is substantial evidence because it could be believed by a jury, and, if believed, could justify Hiltibidal's use of potentially "deadly" force causing the broken ribs.

The State argues that Hiltibidal failed to present evidence that he could not have avoided harming Smith. The State argues that Hiltibidal testified that they had an altercation, walked to another room together, and then had a subsequent altercation. Again, however, Hiltibidal testified that Smith was the initial aggressor in the second location as well. Although the State argues that no one would believe Hiltibidal in light of the evidence, again we find that the law does not permit us to insert our own view of credibility for that of a jury. *See id.*

In view of all the foregoing, we hold that the court erred in failing to instruct on self-defense. Given that, this court must determine "whether the failure to properly instruct the jury resulted in manifest injustice." *Id.* at 301. "It must be emphasized that the self-defense instruction is mandated by the MAI and the Notes on Use, where supported by the evidence." *Id.* "A trial court's failure to give mandatory instructions is presumed prejudicial unless the State clearly establishes that the error did not result in prejudice." *Id.* "Missouri courts have repeatedly found manifest injustice or miscarriage of justice in the failure to instruct, or properly instruct, on self-defense." *Id.*

In considering the issue of manifest injustice, we note that in closing arguments, the prosecutor's argument did not help the jury consider the possibility of self-defense. In reviewing the jury instructions, the prosecutor discussed what the jury must find to reach a verdict of guilty. The prosecutor specifically mentioned that the instructions did not allow the jury to consider self-defense. *Cf. State v. Beck,* 167 S.W.3d 767, 788 (Mo.App.2005) (the prosecution's argument not to consider actions of others, coupled with defective instruction, likely confused jury). In this case, the State argued to the jury:

> There's nothing in the instruction about whether or not she called him a bad name, about whether or not she hit him over the head with a beer bottle or anything else. It's just the things that are in the jury instruction. If you find those things to be present in this case, then you shall find him guilty.

A trial judge may not immediately recognize the need for a self-defense instruction in a case where no notice had been given to the judge that self-defense would be an issue. The record indicates that Hiltibidal's decision to testify was his own and was contrary to counsel's advice. The court presumably had no advance notice of a self-defense claim. Hiltibidal's testimony also was perhaps not the most explicit articulation of self-defense. Nonetheless, this case illustrates the substantial burden placed on the trial court to be alert to evidence raising the issue of self-defense. Here, because there was testimony about Smith breaking the beer bottle on his head and about her alleged attempt to "gouge out his eyes," and because Hiltibidal claimed he acted only in a "defensive mode," the evidence raised an issue as to his right to defend himself. The judge must give the instruction regardless of whether it was requested or not, and regardless of whether self-defense is inconsistent with the defendant's defense. *See, e.g., State v. Westfall,* 75 S.W.3d 278, 281 n. 9 (Mo. banc 2002); *White,* 222 S.W.3d at 297; *State v. January,* 176 S.W.3d 187 (Mo.App.2005); *State v. Goucher,* 111 S.W.3d 915 (Mo.App.2003).

Once there is a finding of error in failing to properly instruct on self-defense, a manifest injustice will generally be found. *See, e.g., Beck,* 167 S.W.3d at 788; *State v. White,* 92 S.W.3d 183, 184 (Mo.App.2002). This would especially be true when the prosecution's argument has likely further confused the jury as to whether self-defense may be considered. Here, there is no showing that there was not a manifest injustice. Accordingly, we must reverse the conviction and remand the case.

### Conclusion

The judgment of conviction is reversed and the matter is remanded for a new trial.[2]

All concur.

---

**2.** We need not address Hiltibidal's second point pertaining to the admission of evidence that he had choked Smith approximately four days prior to the charged attack. We note that self-defense will most likely be an explicit issue in this case on remand. The existence of a self-defense claim presumably will be a factor in the determination as to whether such evidence should be admitted. *See, e.g., State v. Wallace,* 943 S.W.2d 721, 724 (Mo. App.1997).