STATE of Missouri, Respondent,

v.

Robert Lee MANGUM, Appellant.

No. ED 96029.

Missouri Court of Appeals, Eastern District, Division Four.

Jan. 8, 2013.

Timothy Forneris, St. Louis, MO, for appellant.

Chris Koster, Atty. Gen., Daniel N. McPherson, Asst. Atty. Gen., Jefferson City, MO, for respondent.

LAWRENCE E. MOONEY, Presiding Judge.

Defendant Robert Lee Mangum stands convicted of one count of first-degree domestic assault, Section 565.072 RSMo 2000;[1] one count of first-degree assault, Section 565.050; and two counts of armed criminal action, Section 571.015. The convictions stem from an altercation between defendant and his former girlfriend, Amanda, and her sister Melissa, over a house key. During the altercation, defendant fired his gun, hitting Amanda in the shoulder.

We shall consider two of the points the defendant raises in this appeal. First, he challenges the sufficiency of the evidence to sustain his conviction for first-degree assault. The State charged defendant with first-degree assault for shooting in the direction of Melissa. Defendant contends that his act of shooting and hitting Amanda did not evince an intent to seriously injure Melissa necessary to support the conviction. Second, defendant challenges the self-defense instructions submitted by the trial court. Defendant contends that at the time he pulled out his gun and fired, he was under attack from multiple assailants. He thus alleges the trial court plainly erred in failing to *sua sponte* modify the instructions to hypothesize multiple assailants such that the jury could consider the acts of both sisters together in determining whether he was justified in using force to protect himself.

1. All statutory citations are to RSMo 2000.

We first hold the State presented sufficient evidence to sustain defendant's conviction for first-degree assault. We also conclude that the trial court erred in failing to modify the self-defense instructions, and thus we reverse the judgment of conviction and remand for a new trial before a properly instructed jury.

### Factual & Procedural Background

We must consider two significantly different versions of the events that transpired on the fateful night of November 7, 2008. Because the defendant challenges the sufficiency of the evidence, we must set out the facts in the light most favorable to the State. Then, because the defendant alleges error regarding self-defense instructions, we must set out the facts in the light most favorable to the defendant.

*Facts From State's Perspective*

We first recount the facts as the State portrays them.

Defendant dated Amanda for about a year until she ended the relationship. Amanda asked defendant to move out of her apartment, which defendant slowly did over the course of several weeks. Every time defendant went to the apartment to retrieve some belongings, he talked to Amanda about getting back together. Amanda repeatedly told defendant she did not want to continue the relationship. One day, defendant called Amanda to retrieve the last of his belongings, a large television. Amanda told defendant that she was not at home and that he could stop by the apartment to get his television. She also told him to leave his key to her apartment on the entertainment system after he was finished removing his television. According to Amanda, defendant seemed upset that she was not at home and he hung up the phone.

When Amanda returned home at about 11 o'clock that night she saw that the television was gone, but did not see the key where she had asked the defendant to leave it. She searched her apartment, but did not find the key. She called the defendant and asked where he had left the key. Defendant stated he still had the key and would bring it over to her apartment the next day. Amanda was uncomfortable with defendant having the key and asked defendant to bring it over that night. He refused. Amanda asked if they could meet halfway between their houses. He again refused. Amanda asked if she could come to his house and get the key. He agreed to this.

Amanda, accompanied by her older sister Melissa, immediately left for defendant's house. Amanda drove Melissa's car. After about a twenty-minute drive, the two sisters arrived at defendant's home and parked on the street in front of the house, with the driver's side of the car at the curb next to the house. Amanda asked her sister to go get the key. Melissa agreed and got out of the car. Amanda remained in the car, seated in the driver's seat.

Melissa walked around the car and up the stairs to the porch and rang the doorbell. No one answered. She then knocked on the door. Melissa heard some dogs barking inside the home, but no one answered the door. She rang the doorbell again. Again, no one answered. Melissa heard movement inside the house, and Amanda saw a curtain move. Amanda also saw defendant's car parked just in front of her on the street. Melissa stayed on the porch for nearly ten minutes. She was about to turn around and walk back down the stairs when she heard the defendant ask, "Who is it?" Melissa identified herself. The defendant opened the door and asked Melissa what she wanted. Melissa asked for her sister's key. The defendant refused, stating that it was his key

and that Amanda was not getting it back. Amanda called out from the car, asking for her key. Melissa told the defendant that they had just come for the key and that they wanted to go home. Defendant, who by this point had stepped out onto the porch, walked down the stairs, pushing at Melissa. He then threw the key in the yard, in the direction of the car. Defendant approached the driver's side door, asking Amanda if he could talk to her.

Melissa jumped in between the defendant and the car, trying to block defendant from getting to the car. Facing defendant, with the car and her sister behind her, she asked defendant to leave her and her sister alone, and told him that they were leaving. Defendant shoved Melissa, grabbed her by the throat with both hands and lifted her off the ground. Defendant had his hands on Melissa for about two minutes and held her off the ground for approximately thirty seconds. During this time Amanda was yelling at defendant to let her sister go. Amanda then grabbed a crowbar[2] from inside the car and got out of the car. She told defendant to stop choking her sister and raised the crowbar up in her right hand. Amanda did not swing the crowbar at the defendant. She testified at trial that she could not have hit the defendant without also hitting her sister. Defendant let go of Melissa, and stated, "[Y]ou gonna get a crowbar ... I got something." He then pulled a gun out of his pocket and fired three shots. One of the bullets hit Amanda in the shoulder and she dropped the crowbar. Melissa was standing in between defendant and Amanda, less than an arm's length away from the defendant, when defendant fired the shots. Melissa explained that there was little to no space between her and the defendant—that she was basically "a sand-

wich" between her sister and the defendant. After the shots rang out, Melissa turned around, looked at her sister, and saw that she was bleeding and limp. The sisters got into the car and Melissa drove Amanda to the hospital for medical attention.

The police arrested defendant several days later. After being advised of his *Miranda* rights,[3] defendant made an audio-taped statement, telling officers that he had gotten into an argument with Amanda and her sister over the key, that the two women approached him, that he pulled out the gun for protection, and that it "went off." He denied trying to shoot the sisters. A police firearms examiner later tested the gun and testified at trial that the gun was in nice condition and in proper working order, and that it did not have any defects, such as jamming. The examiner further testified that the gun had a nine-pound trigger pull and that it would require an extraordinary set of circumstances for the gun to discharge without the trigger being deliberately pulled.

The State charged defendant with committing one count of first-degree domestic assault for shooting Amanda, one count of first-degree assault for shooting in the direction of Melissa, one count of third-degree assault for choking Melissa, and two counts of armed criminal action. The case proceeded to a jury trial.

*Facts From Defendant's Perspective*

Now we shall learn of the defendant's version of events.

Defendant received a call from Amanda around midnight. Amanda yelled at him about not leaving the key. Defendant responded, telling Amanda that he and his friends were in a rush to get his television

---

**2.** Witnesses also referred to this item as a "tire iron."

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and forgot to leave the key. He told Amanda that he would bring the key back to her the next day. Amanda insisted on meeting halfway, but defendant told her he could not do that because his car was low on gas and it was the middle of the night. Amanda then told him she was coming over to his house. Defendant hung up on Amanda because he did not feel like getting stressed out.

Later that same night, defendant was in his bed watching television when he heard a loud beating at the door. He was not expecting visitors at that time of night. He had not invited Amanda over, and had not agreed to her coming over to get the key. Defendant put on his clothes, grabbed his gun, and went upstairs to make sure his mother was safe. He always kept a gun with him for his mother's and his own protection. After checking on his mother, he went to the door, looked out the peephole and saw a person dressed all in black with a hood covering the person's head. Defendant could not identify the person or tell if the person was a man or a woman, as the person was looking down. According to defendant, the person started kicking the front door with such force that it shook the house. He went to the window, looked out, and saw a car out in the street, but did not recognize it. His mother called the police. Defendant asked who was out there and Melissa identified herself. He asked why she was there and she responded that she wanted the key. Defendant stepped outside onto the porch, at which time defendant said that Melissa aggressively got in his face, yelling and shouting at him about the key. Defendant told Melissa he would give the key back to Amanda.

Defendant argued with Melissa for a while and then walked away from her and headed down the porch stairs to give the key to Amanda. Melissa followed. As he was walking across the yard, Melissa pushed him and put her hands on him, and they got into a physical altercation. According to defendant, Melissa hit him in the eye, scratched his arm, and ripped his shirt during his attack. Melissa hit him in the eye with enough force to blur defendant's vision. While Melissa was attacking him, Amanda got out of the car and began yelling at him. Defendant threw the key across the street. Amanda grabbed the crowbar and threatened to break the windows in his car. Defendant stated he was still struggling with Melissa when Amanda charged at him with the crowbar and started swinging it at his head. Amanda was within three feet of him when she started swinging the crowbar. He pleaded for Amanda to stop. All three of them "tussled."

Defendant testified that while fending off Melissa and Amanda with one hand and being off-balance, he drew his gun from his pocket. He explained that he intended to point the gun towards a nearby hill and fire a warning shot. However, during the struggle, his gun went off and hit Amanda in her right shoulder. Amanda stopped fighting him after being shot, but Melissa kept hitting him. Melissa tried to pick up the crowbar, but Amanda pleaded for Melissa to leave. Defendant told Amanda and Melissa to leave, which they did, and he went back inside the house.

*Trial and Appeal*

The trial court submitted the case to the jury with the following instructions: Instructions No. 5, 6, and 7—the first-degree domestic assault verdict-directing instruction and its corresponding self-defense and armed-criminal action instructions; Instructions No. 8, 9, and 10—the first-degree assault verdict-directing instruction and its corresponding self-defense and armed-criminal action instructions; and Instructions No. 11 and 12—the third-de-

gree assault verdict-directing instruction and its corresponding self-defense instruction. The self-defense instruction submitted in conjunction with the domestic-assault instruction asked the jury to consider whether the defendant reasonably believed that the use of force against Amanda was necessary to protect himself from the acts of Amanda. The self-defense instructions submitted in conjunction with the first-degree and third-degree assault instructions asked the jury to consider whether the defendant reasonably believed that the use of force against Melissa was necessary to protect himself from the acts of Melissa.[4]

The jury found defendant guilty of domestic assault, first-degree assault, and two counts of armed criminal action. The jury acquitted defendant on the third-degree assault charge. The trial court sentenced defendant to concurrent terms of six years' imprisonment for domestic assault, six years' imprisonment for first-degree assault, and three years' imprisonment for each count of armed criminal action, for a total of six years' imprisonment in the custody of the Missouri Department of Corrections.

Defendant advances four points on appeal. However, because they are dispositive, we only address two of those points— his challenge to the sufficiency of the evidence to support his conviction for first-degree assault, and his claim of error regarding the self-defense instructions. We shall address these in turn.

### Sufficiency of the Evidence: First–Degree Assault

In reviewing a challenge to the sufficiency of the evidence, this Court's review is limited to determining "whether the State has introduced sufficient evidence for any reasonable juror to have been convinced of guilt beyond a reasonable doubt." *State v. Bateman,* 318 S.W.3d 681, 686–87 (Mo. banc 2010) (internal quotation omitted). We accept as true all evidence supporting the jury's verdict, including all favorable inferences drawn from the evidence. *Id.* We disregard all evidence and inferences contrary to the verdict. *Id.*

A person commits first-degree assault "if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person." Section 565.050.1. The charge as submitted to the jury in this case required a finding that defendant attempted to cause serious physical injury to Melissa by shooting in her direction. Defendant contends the State failed to prove the requisite intent to support the conviction. Specifically, he argues that his act of shooting once and hitting Amanda did not evince an intent to seriously injure Melissa.

■ Direct evidence of a defendant's intent is rarely available, thus intent is most often proved by circumstantial evidence and permissible inferences. *State v. Perry,* 275 S.W.3d 237, 248 (Mo. banc 2009); *State v. Manley,* 223 S.W.3d 887, 890 (Mo.App. W.D.2007). A jury can infer the necessary intent from surrounding facts, such as the defendant's conduct before and after the act, the type of weapon used, the manner and circumstances under which it is used, the results, and other relevant factors. *Manley,* 223 S.W.3d at 891; *State v. Burse,* 231 S.W.3d 247, 252 (Mo.App. E.D.2007). It is "presumed that a person intends the natural and probable consequences of his acts." *State v. O'Brien,* 857 S.W.2d 212, 218 (Mo. banc 1993); *Manley,* 223 S.W.3d at 891. "A jury can infer intent to cause physical bodily harm when under the circumstances,

**4.** The full text of these self-defense instruc- tions appears in the appendix to this opinion.

the prohibited result may reasonably be expected to follow from a voluntary act, irrespective of any subjective desire on the part of the offender to have accomplished the prohibited result." *Manley*, 223 S.W.3d at 891 (internal quotation omitted).

█ Accepting the State's evidence as true, we hold that the State presented sufficient evidence to permit a reasonable juror to find beyond a reasonable doubt that defendant attempted to cause Melissa serious physical injury. The defendant and Melissa had been engaged in verbal and physical fighting prior to the shooting. Indeed, immediately prior to the shooting, defendant had both hands around Melissa's neck, choking her and holding her off the ground. He let go of her to grab the gun out of his pocket. Melissa was in front of the defendant, within an arm's length of the defendant, when defendant fired his gun in the direction of Melissa and Amanda. Defendant fired three shots. A defendant's mental state may be reasonably inferred from the act itself. *State v. Theus*, 967 S.W.2d 234, 239 (Mo.App. W.D. 1998). If a defendant knows the probable consequences of the assault will be to injure any one or all of the persons he sees, he will be liable as to any one of them. *Id.* The evidence shows that defendant knew Melissa was in front of him, in close proximity, when he pulled out and fired his gun. Defendant does not contend otherwise. This awareness makes defendant liable for attempting to cause serious physical injury to Melissa. We deny this point.

### Self–Defense Instructions

The next issue presented for our consideration is whether the self-defense instruc-

tions submitted by the trial court should have hypothesized multiple assailants. Defendant alleges the trial court plainly erred in submitting Instructions No. 6, No. 9, and No. 12—the self-defense instructions.[5] He contends the evidence shows he acted in response to multiple assailants, and therefore the trial court erred in failing to modify the instructions to reflect that his use of deadly force in self-defense was based upon an attack by multiple assailants. He submits the court should have modified the instructions so as to instruct the jury that it could consider the acts of both Melissa and Amanda, together, rather than just the acts of the one particular sister whom he was charged with assaulting, in determining whether he was justified in using force to protect himself.

We first address whether defendant's allegation of trial-court error is reviewable or whether the defendant has waived review of his claim. Defendant acknowledges that he did not preserve his claim for our review. He did not raise an objection at the instruction conference and he did not include the issue in his motion for new trial. *See, e.g., State v. Germany*, 323 S.W.3d 472, 477 (Mo.App. E.D.2010) (noting that in order to preserve claims of instructional error for review, counsel must make a specific claim of error at trial and again raise the error in the motion for new trial). Defendant requests plain-error review under Rule 30.20.

Rule 30.20 provides that this Court, in its discretion, may consider plain errors affecting substantial rights if manifest in-

---

5. Defendant's assertion of error as to Instruction No. 12 is misplaced. The court gave that self-defense instruction in connection with the instruction for third-degree assault. The jury acquitted defendant of that charge. Thus, there can be no claim of error regarding that instruction. We therefore limit our discussion to Instruction Nos. 6 and 9, the self-defense instructions given in conjunction with the domestic assault and first-degree assault charges.

justice or a miscarriage of justice has occurred. Rule 28.03, however, states clearly that a party may not assign as error the giving or failure to give an instruction if the party fails to object to an instruction before the jury retires to consider its verdict. Our Missouri Supreme Court, in addressing the interplay between these two rules, concluded that the court may still review unpreserved claims of instructional error under Rule 30.20 if manifest injustice would otherwise occur. *State v. Wurtzberger*, 40 S.W.3d 893, 898 (Mo. banc 2001).

■ This, however, does not end our inquiry. As shown by our Supreme Court's recent *Bolden* decision, a defendant may still waive plain-error review of claimed instructional error. *State v. Bolden*, 371 S.W.3d 802 (Mo. banc 2012). The *Bolden* court held that when a defendant proffers an instruction, the defendant waives appellate review—even plain-error review—of the trial court's submission of that instruction to the jury. *Id.* at 806. This is so, even if the instruction is erroneous, as it was in *Bolden*. *Id.* Noting the long-standing principle that a party may not take advantage of self-invited error, the Court held that it would not use plain error to impose a *sua sponte* duty on the trial court to correct erroneous instructions proffered by the complaining party. *Id.* Here, however, the record contains no indication that defendant proffered the self-defense instructions of which he now complains. We can find no waiver of plain-error review here.

■ It is often said that instructional error seldom rises to the level of plain error. *See, e.g., State v. Davies*, 330 S.W.3d 775, 788 (Mo.App. W.D.2010).

Nonetheless, plain error can occur. The trial court must instruct on self-defense when substantial evidence is adduced to support the defense. *See, e.g., State v. Westfall*, 75 S.W.3d 278, 280–81 (Mo. banc 2002); *State v. Weems*, 840 S.W.2d 222, 226 (Mo. banc 1992). Failure to instruct on a defense supported by the evidence is reversible plain error. *Id.; see also, e.g., State v. Avery*, 120 S.W.3d 196, 203 (Mo. banc 2003); *State v. White*, 222 S.W.3d 297, 301 (Mo.App. W.D.2007); *State v. Hiltibidal*, 292 S.W.3d 488, 493 (Mo.App. W.D.2009); *State v. Seay*, 256 S.W.3d 197, 200 (Mo.App. E.D.2008). Additionally, "[i]n the context of instructional error, plain error results when the trial court has so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error affected the jury's verdict." *State v. Doolittle*, 896 S.W.2d 27, 29 (Mo. banc 1995) (quotation omitted). In determining whether the misdirection likely affected the jury's verdict, an appellate court is more inclined to reverse in cases "where the erroneous instruction did not merely allow a wrong word or some other ambiguity to exist, but excused the State from its burden of proof on a contested element of the crime." *State v. Roe*, 6 S.W.3d 411, 415 (Mo.App. E.D.1999) (internal quotation omitted); *see also State v. White*, 92 S.W.3d 183, 193 (Mo.App. W.D.2002) (reversing for instructional error, finding submitted instructions relieved State of its burden of proof).

■ The right of self-defense is a person's privilege to defend himself or herself against attack. *State v. Chambers*, 671 S.W.2d 781, 783 (Mo. banc 1984). The right is codified in Section 563.031.[6] The

---

6. Section 563.031 reads:
 1. A person may, subject to the provisions of subsection 2 of this section, use physical force upon another person when and to the extent he or she reasonably believes such

force to be necessary to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful force by such other person, unless:

question here, of course, is not whether defendant carried his burden of injecting the issue of self-defense into the case, requiring the trial court to instruct on self-defense. The trial court did submit such instructions. The question, instead, is whether the trial court should have modified those instructions to reflect multiple assailants. The trial court patterned the complained-of instructions after MAI–CR3d 306.06, the mandatory Missouri approved instruction for submitting self-defense. This approved instruction may be modified if evidence exists showing that the defendant acted in self-defense against an attack by multiple assailants. MAI–CR3d 306.06, Note on Use 7. For example, a modification to the initial, "general" part

("Part A") of the approved instruction would read:

> In order for a person lawfully to use force in self-defense, he must reasonably believe he is in imminent danger of harm from the other person *and from persons he reasonably believes are acting together with the other person.* He need not be in actual danger but he must have a reasonable belief that he is in such danger.

*Id.* (emphasis added, indicating the modification). By contrast, the corresponding part of the instructions in this case read:

> In order for a person lawfully to use force in self-defense, he must reasonably believe such force is necessary to defend himself from what he reasonably be-

(1) The actor was the initial aggressor; except that in such case his or her use of force is nevertheless justifiable provided:

(a) He or she has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened use of unlawful force; or

(b) He or she is a law enforcement officer and as such is an aggressor pursuant to section 563.046; or

(c) The aggressor is justified under some other provision of this chapter or other provision of law;

(2) Under the circumstances as the actor reasonably believes them to be, the person whom he or she seeks to protect would not be justified in using such protective force;

(3) The actor was attempting to commit, committing, or escaping after the commission of a forcible felony.

2. A person may not use deadly force upon another person under the circumstances specified in subsection 1 of this section unless:

(1) He or she reasonably believes that such deadly force is necessary to protect himself, or herself or her unborn child, or another against death, serious physical injury, or any forcible felony;

(2) Such force is used against a person who unlawfully enters, remains after unlawfully entering, or attempts to unlawfully enter a

dwelling, residence, or vehicle lawfully occupied by such person; or

(3) Such force is used against a person who unlawfully enters, remains after unlawfully entering, or attempts to unlawfully enter private property that is owned or leased by an individual claiming a justification of using protective force under this section.

3. A person does not have a duty to retreat from a dwelling, residence, or vehicle where the person is not unlawfully entering or unlawfully remaining. A person does not have a duty to retreat from private property that is owned or leased by such individual.

4. The justification afforded by this section extends to the use of physical restraint as protective force provided that the actor takes all reasonable measures to terminate the restraint as soon as it is reasonable to do so.

5. The defendant shall have the burden of injecting the issue of justification under this section. If a defendant asserts that his or her use of force is described under subdivision (2) of subsection 2 of this section, the burden shall then be on the state to prove beyond a reasonable doubt that the defendant did not reasonably believe that the use of such force was necessary to defend against what he or she reasonably believed was the use or imminent use of unlawful force.

lieves to be the imminent use of unlawful force.

Similar modifications hypothesizing multiple assailants may also be necessary to the later, "specific" and "special matters" portions of the instructions ("Part B" and "Part C"). MAI–CR3d 306.06, Note on Use 7. For instance, a modification to the specific part of the approved instruction would possibly read:

> If the defendant was not the initial aggressor in the encounter with [name of victim] and if the defendant reasonably believed he was in imminent danger of death or serious physical injury from the acts of [name of victim] *and those whom the defendant reasonably believed were acting in concert with [name of victim]* and defendant reasonably believed that the use of deadly force was necessary to defend himself, then defendant acted in lawful self-defense.

(Emphasis added, indicating modification.) By contrast, the self-defense instruction given here in conjunction with the domestic-assault count, and similarly given in conjunction with the first-degree assault count (substituting the name "Melissa" for "Amanda"), read:

> First, if the defendant was not the initial aggressor in the encounter with Amanda,
>
> Second, if the defendant reasonably believed that the use of force was necessary to defend himself from what he reasonably believed to be the imminent use of unlawful force,
>
> Third, the defendant reasonably believed that the use of deadly force was necessary to protect himself from death or serious physical injury *from the acts of Amanda,* then his use of deadly force is justifiable and he acted in lawful self-defense.

(Emphasis added.)

We must remember that in determining whether the evidence supports the giving of an instruction, the court views the evidence in the light most favorable to the defendant. *See Westfall,* 75 S.W.3d at 280; *Hiltibidal,* 292 S.W.3d at 493; *State v. Miller,* 91 S.W.3d 630, 632 (Mo.App. W.D.2002); *State v. Habermann,* 93 S.W.3d 835, 837 (Mo.App. E.D.2002). And, accepting the defendant's evidence, we hold substantial evidence exists to support self-defense instructions modified to hypothesize the actions of multiple assailants. Defendant asserts that he was fending off both Melissa and Amanda at the time he drew his gun from his pocket to fire a shot. Melissa had attacked him, hitting him in the eye. He was still struggling with Melissa when Amanda charged at him with the crowbar and started swinging at his head from less than three feet away.

We note the dicta in *Bolden,* where our Supreme Court noted that the defense-of-others instruction in that case should have hypothesized multiple assailants. *Bolden,* 371 S.W.3d at 805. In *Bolden,* the defendant and her brother arrived at the victim's home looking for two other individuals. The victim's daughter answered the door, told defendant and defendant's brother that the individuals they sought were not there, and ordered them to leave. A melee ensued. According to defendant, victim's daughter was the initial aggressor, stabbing defendant's brother in the eye. Upon seeing this, defendant started swinging her knife at victim, stabbing victim eleven times. *Id.* at 804.

In some respects, our facts are quite similar to those in *Bolden.* Like *Bolden,* we have two purported assailants—the victim and her sister. Like *Bolden,* one of the assailants had a weapon, a crowbar, that she was swinging in the direction of defendant. We do not know exactly what

the second assailant did in *Bolden*—according to the facts set out, she did nothing. Yet, the Court said the instruction submitted in the case did not properly instruct the jury that it could consider the actions of multiple assailants when considering whether defendant acted in lawful defense of another person. *Id.* at 805. Certainly if a multiple-assailant instruction should have been given in a case where the second assailant apparently did little to nothing, then such an instruction should have been given in this case where the second assailant, who had already hit defendant in the eye with enough force to blur his vision, was still attacking the defendant when her sister charged at defendant and started swinging a crowbar in the direction of his head.

*State v. Goodine* is another case involving multiple assailants. *State v. Goodine,* 196 S.W.3d 607 (Mo.App. S.D.2006). There, however, the court found no plain error on the part of the trial court in failing to modify self-defense instructions to hypothesize actions of multiple assailants. Our colleagues in the Southern District relied upon two passages from the submitted instruction in so ruling. First, the instruction defined reasonable belief as "a belief based on a reasonable grounds, that is, grounds which could lead a reasonable person *in the same situation* to the same belief." Second, the submitted instruction stated in the final paragraph "you, however, should consider *all of the evidence* in the case in determining whether the defendant acted in lawful self-defense." (Emphases added by *Goodine* court). From these two passages, the court reasoned that the instruction submitted allowed the jury to consider the actions of the victim's associates because the jury could consider "the situation" of the defendant in determining whether he had a reasonable belief that he was in imminent danger of harm, and because the jury was instructed to not only consider the evidence of the victim's acts, but also to consider all the evidence. *Id.* at 621–22.

Our instruction contains the same definition of reasonable belief as in the *Goodine* case. Our instruction, however, does not include the second passage, directing the jury to consider *all of the evidence* in determining whether the defendant acted in lawful self-defense. The absence of this passage alone distinguishes our case from *Goodine.*

*State v. Beck* is yet another case involving multiple assailants. *State v. Beck,* 167 S.W.3d 767 (Mo.App. W.D.2005). There, the defendant stabbed the victim after the victim grabbed defendant from behind while two of the victim's friends approached defendant brandishing a baseball bat and a metal pipe in a threatening manner. The *Beck* court, as here, submitted a self-defense instruction, but did not modify it to instruct the jury that it could consider not only the actions of the victim, but also the acts of the victim's friends, in determining whether the defendant acted in self-defense in stabbing the victim. The Western District found plain error on the part of the trial court in failing to modify the instructions to hypothesize multiple assailants. *Id.* at 788–89. We acknowledge that *Beck* has been overruled in part by *Bolden* because the defendant attacked an instruction that he himself submitted at trial. *Bolden,* 371 S.W.3d at 806. Nevertheless, the court's reasoning in finding the submitted instruction erroneous and in finding reversible plain error is sound and persuasive.

The instruction submitted in *Beck* contained the same provision and definition of "reasonable belief" as that in this case and the *Goodine* case. We do not know whether the *Beck* self-defense instruction contained the second, "all of the evidence,"

passage as in *Goodine.* The *Beck* court agreed with the State that the inclusion of the mandatory definition of "reasonable belief" in the self-defense instruction would seem to instruct the jury that it could consider "the situation" or the totality of the circumstances, including the acts of the victim's friends, in determining whether the defendant, in stabbing the victim, acted out of necessity in defending himself from harm or injury. *Id.* at 787–88. The court noted, however, that the instruction later instructed:

> "If the defendant was not the initial aggressor in the encounter with the victim, and the defendant reasonably believed he was in imminent danger of harm from the acts of the victim and the defendant used only such force as reasonably appeared to be necessary to defendant himself, then he acted in lawful self-defense."

The court found it reasonable to conclude from this passage that the jury believed it could only consider the acts of the victim in considering whether the defendant acted in lawful self-defense in stabbing the victim. *Id.* at 788.

The *Beck* court acknowledged that some argument could be made that the "acts of the victim" language from this passage only applied to the jury's determination of the issue of "imminent danger of harm," and not to its determination of the defendant's belief as to the necessity of his response to the victim's alleged unlawful acts to avoid harm or injury. *Id.* at 788. The court noted this would then leave room to argue that the instruction instructed the jury that it could consider the totality of the circumstances, including the acts of the victim's friends, in determining the reasonableness of the defendant's belief as to the necessity for stabbing the victim in order to avoid harm or injury. The court, however, rejected the notion

that the jury could have made this fine distinction, especially given the State's closing argument in the case. *Id.* In closing, the State argued: "I would suggest you read the court's instruction to you on self-defense. It only relates to what [the victim] did, not what anybody else—what the defendant claims somebody else did." *Id.* The court held this argument, coupled with the instruction, would have undoubtedly led the jury to believe, contrary to law, that it could not consider the acts of the victim's friends, in any manner, in deliberating on whether the defendant acted in lawful self-defense. *Id.* In the end, the court found reversible plain error because the instruction gave the State a pass on proving the negative of a contested element of the offense charged, that the defendant did not act in lawful self-defense when he stabbed the victim. *Id.* at 788–89.

Our case is quite similar to *Beck.* Again, our instructions included the same definition of "reasonable belief." We acknowledge, just as in *Beck,* that in determining whether the defendant's beliefs were reasonable, the jury could consider "the same situation" or the totality of circumstances, which would include the acts of the other sister. But, just as in *Beck,* the instructions here went on to specifically instruct, in pertinent part, that the defendant acted in lawful self-defense if he reasonably believed that the use of deadly force was necessary to protect himself from death or serious physical injury from the acts of a single sister, either Amanda or Melissa. Like in *Beck,* it is reasonable to conclude from this that the jury believed it could only consider the acts of the one particular victim in considering whether the defendant acted in lawful self-defense. Like in *Beck,* this is especially so, given the closing arguments. In closing here, the prosecutor pointed out that for the self-defense instruction for first-degree assault, defendant "had to believe Melissa's actions

would cause death or serious physical injury." Like in *Beck,* we hold this argument, coupled with the instruction, would have undoubtedly led the jury to believe, contrary to the law, that it could not consider the acts of the other sister, in any manner, in deliberating on whether defendant acted in lawful self-defense in shooting his gun.

The State submits that modification of the instructions was not warranted here because Melissa was only hitting and slapping the defendant. The State argues that because defendant did not face the threat of death or serious physical injury from Melissa, he was therefore not justified in using deadly force against her. The State therefore posits that Melissa's actions were irrelevant in determining whether defendant was justified in using deadly force against Amanda, and therefore no instruction hypothesizing multiple assailants was necessary.

■ We are not persuaded. The State correctly notes that deadly force generally cannot be used to repel a simple assault and battery. *State v. Wiley,* 337 S.W.3d 41, 45 (Mo.App. S.D.2011). But the State offers no authority for its contention that

each assailant of a multi-assailant attack must individually threaten defendant with death or serious physical injury in order for defendant to receive an instruction hypothesizing multiple assailants.

■ We note that in the context of accessorial liability, the acts of one become the acts of another. The law of accessory liability in Missouri emanates from statutes, as construed by the courts.[7] *State v. Barnum,* 14 S.W.3d 587, 590 (Mo. banc 2000). "A person is criminally responsible for the conduct of another when either before or during the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." Section 562.041.1(2). The doctrine of accomplice liability embodied in Missouri's statutes is designed to make individuals who could not be guilty of a crime solely on the basis of their own conduct, nonetheless guilty. *Barnum,* 14 S.W.3d at 590 (citing Comment, section 562.041.1(2)). All persons who "act in concert" are equally guilty. *Id.* at 591. Recall the suggested MAI language modifying the approved self-defense instruction

---

7. Section 562.036 and Section 562.041 deal with accountability for conduct and responsibility for the conduct of another:

**Section 562.036. Accountability for conduct**
A person with the required culpable mental state is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is criminally responsible, or both.

**Section 562.041. Responsibility for the conduct of another**
1. A person is criminally responsible for the conduct of another when
(1) The statute defining the offense makes him so responsible; or
(2) Either before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense.

2. However, a person is not so responsible if:
(1) He is the victim of the offense committed or attempted;
(2) The offense is so defined that his conduct was necessarily incident to the commission or attempt to commit the offense. If his conduct constitutes a related but separate offense, he is criminally responsible for that offense but not for the conduct or offense committed or attempted by the other person;
(3) Before the commission of the offense he abandons his purpose and gives timely warning to law enforcement authorities or otherwise makes proper effort to prevent the commission of the offense.
3. The defense provided by subdivision (3) of subsection 2 is an affirmative defense.

to hypothesize multiple assailants: "... and from persons he reasonably believes *are acting together* with the other person." MAI–CR3d 306.06, Note on Use 7 (emphasis added). We find this language meaningfully similar to the accessorial-liability language "acting in concert." The old adage—"what's good for the goose is good for the gander"—seems apropos here.[8] If two assailants acting in concert are equally guilty for their attack, should not the victim of that attack be entitled to view those assailants as acting in concert and presenting a common threat, and receive an instruction hypothesizing multiple assailants? The State advocates that in the panic of responding to an attack, one must stop and separately evaluate the actions of each assailant, and respond respectively. And, again, the State cites not a single case for its tenuous position.

While we acknowledge the right to self-defense varies from state to state, we find support in several out-of-state cases. Indeed, we have found no contrary authority. The first two cases come from the state of Texas. In *Lerma v. State*, 807 S.W.2d 599 (Tex.App.—Houston [14 Dist.] 1991), a teenage defendant became fearful when two adults pushed, struck, and cursed him during an argument. The defendant observed that one of the adults possessed a gun. Defendant exited the building, ran for his car, with the two adult assailants and others in pursuit. Defendant got in his car but did not have the ignition keys. Defendant feared for his life. He pulled out a gun from the glove compartment and sat with the cocked gun in his lap. Defendant stated that someone reached in and pulled the gun. The gun fired, killing the unarmed assailant. The trial court instructed on self-defense, but restricted defendant's right of self-defense to the words or conduct of the deceased alone. The trial court denied defendant's request for a multiple-assailant instruction. *Lerma*, 807 S.W.2d at 600–01. The Texas appellate court reversed defendant's murder conviction, holding that the jury should have been allowed to consider the actions of both assailants in determining whether defendant had acted in lawful self-defense. *Id.* at 601–02.

*Frank v. State*, 688 S.W.2d 863 (Tex.Cr. App.1985), is another multiple-assailant decision from Texas. There, an ex-wife and her adult son surprised the defendant in the yard at his house. Defendant knew his ex-wife often carried a knife and a gun. He also knew the adult son often carried a gun and had been in several knife fights. Defendant testified that since the time he and his ex-wife began having marital problems, his ex-wife's children, particularly her adult son, had threatened and harassed him, and had destroyed his property. The adult son threatened defendant's life on several occasions. Shortly before arriving at defendant's house on the day in question, the adult son drove by the house, shouted at the defendant, and told him he would return with his gun. By the aggressive manner in which the ex-wife and her adult son approached defendant in the yard, defendant feared for his life, even though no weapons had been displayed. Defendant shot both of them, killing the ex-wife. The trial court gave an instruction on the law of self-defense against an attack by the deceased, but refused the requested instruction on self-defense against a joint attack. *Frank*, 688 S.W.2d at 866–67. The State on appeal, similar to here, argued that a multiple-assailant instruction was unwarranted because the son

---

**8.** Ray, English culinary proverb, 1670: "What is sauce for the goose is sauce for the gander."

had no weapon and had not made a move as if to draw a weapon. *Id.* at 868. The Texas appellate court disagreed and reversed defendant's conviction, holding that defendant was entitled to a multiple-assailant instruction. *Id.* These Texas cases hold us that "a defendant is entitled to a charge on the right of self-defense against multiple assailants if there is evidence, viewed from the accused's standpoint, that he was in danger of an unlawful attack or a threatened attack at the hands of more than one assailant." *Id.* (internal quotation omitted); *Lerma,* 807 S.W.2d at 601.

Other courts also hold that a multiple-assailant self-defense instruction is warranted even when the person the defendant assaulted never posed a direct threat of harm to the defendant, as long as evidence exists showing that the person the defendant assaulted participated or acted in concert with the other assailant. For example, the Mississippi Supreme Court noted long ago:

> ... that where one is attacked by several assailants at the same time, he is justified in acting upon the hostile demonstration of any one of them. That if he is in danger of the loss of his life or of great bodily harm at their hands, he has the right to take the life of any one of them, or all of them, if necessary to save himself, although it develops afterwards that only one of them is armed with a deadly weapon. When he sees one of them with a deadly weapon threatening his life, or great bodily harm, he does not have to stop to see whether or not the others are armed; he has the right to assume that they are acting in concert, and that each one is acting for all.

*Gordon v. State,* 193 Miss. 374, 9 So.2d 877, 878 (1942). In more recent times, the Wyoming Supreme Court, in addressing a trial court's failure to give a "defense of others" instruction, " '[t]here is no appar-

ent reason why an *'aggressor,'* for the purposes of the defense, should be limited to the person directly threatening harm to the defendant.' " *Duckett v. State,* 966 P.2d 941, 945, 946 (Wyo.1998) (quoting 2 Robinson, *Criminal Law Defenses,* § 131(b) at 73 (1984)(emphasis in original)). The Court further noted:

> The common law extends the right of self-defense to defend against any number of assailants, who are acting together, when a defendant is in danger of serious bodily harm.... "[The right to defend another] has been held to be available even if the defendant's act of defense was not directed against the actual assailant, but was directed against a person who, under the particular circumstances, could reasonably be suspected at that time of being a criminal confederate of the direct assailant." 6 Am.Jur.2d, *Assault and Battery,* § 63 at 58 (1963)(*citing Gafford v. State,* 37 Ala.App. 377, 68 So.2d 858, 859–60 (1953)).

*Duckett,* 966 P.2d at 944–45. *See also State v. Cooper,* 128 N.M. 428, 993 P.2d 745 (N.M.App.1999) (holding that when a defendant is threatened by multiple assailants acting in concert, and uses one assailant as a shield against the other assailant, the defendant is entitled to a self-defense instruction with regard to charges of assault against the person used as a shield).

 We hold that a multiple assailant self-defense instruction is warranted even when the person the defendant assaulted never posed a direct threat of bodily harm to the defendant, as long as there is evidence that the person the defendant assaulted acted in concert with the assailant. Stated differently, when two or more persons undertake overt action to harm another, the victim may use an appropriate amount of force to defend himself against either aggressor, or both of them. If sup-

ported by the evidence, the defendant is entitled to a self-defense instruction in which the jury considers threatened harm from all assailants, not just the one against whom the defendant may have retaliated.

 Having found the submitted instruction in this case erroneous, we now consider whether the trial court's failure to modify the instructions rose to the level of reversible plain error. We conclude it does. To begin, the evidence supports a defense against multiple assailants. We can find no principled distinction between the failure to instruct on self-defense where there is only one purported assailant and the failure to instruct on self-defense where there are multiple purported assailants.

We also find plain error because the instructions submitted erroneously instructed on a contested element of the State's case, albeit in the negative. Once the trial court determined that the defendant had carried his burden of injecting the issue of self-defense into the case, it was the State's burden to prove, beyond a reasonable doubt, that the defendant did not act in lawful self-defense when he shot his gun. The instructions submitted excused the State from this burden. *See Beck*, 167 S.W.3d at 788–89.

We reverse defendant's convictions of first-degree domestic assault, first-degree assault, and the accompanying counts of armed criminal action. We remand the cause for a new trial before a properly instructed jury.

PATRICIA L. COHEN, J., and KURT S. ODENWALD, J., concur.

## APPENDIX

Instruction No. 6, the self-defense instruction submitted in conjunction with the first-degree domestic assault verdict-direction instruction read as follows:

### Instruction No. 6

One of the issues as to Count I is whether the use of force by the defendant against Amanda ... was lawful. In this state, the use of force, including the use of deadly force, to protect oneself is lawful in certain situations.

A person can lawfully use force to protect himself against an unlawful attack. However, an initial aggressor, that is, one who first attacks or threatens to attack another, is not justified in using force to protect himself from the counter-attack that he provoked.

In order for a person lawfully to use force in self-defense, he must reasonably believe such force is necessary to defend himself from what he reasonably believes to be the imminent use of unlawful force.

But, a person is not permitted to use deadly force unless he reasonably believes that the use of deadly force is necessary to protect himself against death or serious physical injury.

As used in this instruction, "deadly force" means physical force which is used with the purpose of causing or which a person knows to create a substantial risk of causing death or serious physical injury.

As used in this instruction, the term "reasonably believe" means a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false.

On the issue of self-defense as to Count I, you are instructed as follows:

First, if the defendant was not the initial aggressor in the ***encounter with Amanda*** ...,

Second, if the defendant reasonably believed that the use of force was necessary to defend himself from what he reasonably believed to be the imminent use of unlawful force,

Third, the defendant reasonably believed that the use of deadly force was necessary to protect himself from death or serious physical injury *from the acts of Amanda* ..., then his use of deadly force is justifiable and he acted in lawful self-defense.

The state has the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. Unless you find beyond a reasonable doubt that the defendant did not act in lawful self-defense under this instruction, you must find the defendant not guilty under Count I.

(Emphases added).

\* \* \*

Instruction No. 9, the self-defense instruction submitted in conjunction with the first-degree assault verdict-directing instruction read as follows:

### Instruction No. 9

One of the issues as to Count III is whether the use of force by the defendant against Melissa ... was lawful. In this state, the use of force, including the use of deadly force, to protect oneself is lawful in certain situations.

A person can lawfully use force to protect himself against an unlawful attack. However, an initial aggressor, that is, one who first attacks or threatens to attack another, is not justified in using force to protect himself from the counter-attack that he provoked.

In order for a person lawfully to use force in self-defense, he must reasonably believe such force is necessary to defend himself from what he reasonably believes to be the imminent use of unlawful force.

But, a person is not permitted to use deadly force unless he reasonably believes that the use of deadly force is necessary to protect himself against death or serious physical injury.

As used in this instruction, "deadly force" means physical force which is used with the purpose of causing or which a person knows to create a substantial risk of causing death or serious physical injury.

As used in this instruction, the term "reasonably believe" means a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false.

On the issue of self-defense as to Count III, you are instructed as follows:

First, if the defendant was not the initial aggressor in the *encounter with Melissa* ...,

Second, if the defendant reasonably believed that the use of force was necessary to defend himself from what he reasonably believed to be the imminent use of unlawful force,

Third, the defendant reasonably believed that the use of deadly force was necessary to protect himself from death or serious physical injury *from the acts of Melissa* ..., then his use of deadly force is justifiable and he acted in lawful self-defense.

The state has the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. Unless you find beyond a reasonable doubt that the defendant did not act in lawful

self-defense under this instruction, you must find the defendant not guilty under Count III.

(Emphases added).